RECEIVED IN
COURT OF CRIMINAL APPEALS

March 12, 2015

ABEL ACOSTA, CLERK

WR-82,831-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/11/2015 4:50:31 PM
Accepted 3/12/2015 9:04:46 AM
ABEL ACOSTA
CLERK

NO. WR-82,831-01

IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

JUL 29 2015

Abel Acosta, Cierk

IN RE LUIS SOLIS-GONZALEZ

## THE STATE'S (REAL PARTY IN INTEREST) RESPONSE TO RELATOR'S PETITION FOR WRIT OF MANDAMUS

## TRIAL COURT CAUSE NUMBER 20120D04103
## IN THE 243rd DISTRICT COURT OF EL PASO COUNTY, TEXAS

JAIME ESPARZA
DISTRICT ATTORNEY
34th JUDICIAL DISTRICT

This document contains some pages that are of poor quality at the time of imaging.

LILY STROUD
ASST. DISTRICT ATTORNEY
DISTRICT ATTORNEY'S OFFICE
201 EL PASO COUNTY COURTHOUSE
500 E. SAN ANTONIO
EL PASO, TEXAS 79901
(915) 546-2059 ext. 3769
FAX (915) 533-5520
EMAIL lstroud@epcounty.com
SBN 24046929

ATTORNEYS FOR THE STATE

The State requests oral argument.

ELECTRONIC
RECORD

## IDENTITY OF PARTIES AND COUNSEL

**Relator** – Luis Solis-Gonzalez, represented in this mandamus proceeding and underlying criminal case by Joe A. Spencer, Jr., 1009 Montana Avenue, El Paso, Texas 79902, and Joshua C. Spencer, 1009 Montana Avenue, El Paso, Texas 79902.

**Respondent** – Honorable Luis Aguilar, Judge, 243rd District Court of El Paso County, Texas, 500 E. San Antonio Ave., 9th Floor, El Paso, Texas 79901.

**Real Party in Interest** – The State of Texas, District Attorney, 34th Judicial District, represented in this mandamus proceeding by District Attorney Jaime Esparza and Assistant District Attorney Lily Stroud, 201 El Paso County Courthouse, 500 E. San Antonio, El Paso, Texas 79901, and represented in the underlying criminal case by District Attorney Jaime Esparza and Assistant District Attorneys Denise Butterworth and James Montoya, 201 El Paso County Courthouse, 500 E. San Antonio, El Paso, Texas 79901.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ii

INDEX OF AUTHORITIES v-vi

STATEMENT OF THE CASE vii-ix

STATEMENT OF FACTS 1-14

**STATE'S RESPONSE TO RELATOR'S PETITION FOR WRIT OF
MANDAMUS: Article 38.43 only mandates the testing of biological evidence
as defined by subsection (a), and the trial court is afforded discretion as the
"gatekeeper" in determining whether the State has rebutted the presumption
that any biological material the defendant requests to be tested constitutes
biological evidence required to be tested. In this case, the trial court's initial
order granting the State's request for DNA testing did not constitute a
determination that the evidence the State sought, on its own initiative, to be
tested was biological evidence required to be tested under subsection (i).
Additionally, the record is devoid of any specific request by Solis-Gonzalez
for DNA testing of certain untested biological material. But even assuming,
*arguendo*, that Solis-Gonzalez made any such a request, the State sufficiently
rebutted any presumption that there existed untested biological material that
constituted biological evidence required to be tested. Consequently, the trial
court did not abuse its discretion, or violate a ministerial duty, in determining
that, in the absence of biological evidence required to be tested, it would not
further delay Solis-Gonzalez's trial.** 15

ARGUMENT AND AUTHORITIES 15-49

PRAYER 50

SIGNATURES 50-51

CERTIFICATE OF COMPLIANCE 50

CERTIFICATE OF SERVICE                                              51

APPENDICES A-L                              ATTACHED TO END OF RESPONSE

iv

# INDEX OF AUTHORITIES

## STATE CASES

*Bell v. State*, 90 S.W.3d 301 (Tex.Crim.App. 2002).................... 44, 47

*Bennett v. Paxson*, 932 S.W.2d 81 (Tex.App.–El Paso 1996,
orig. proceeding)................................... 16

*Board of Pardons and Paroles ex rel. Keene v. Court of Appeals
for the Eighth District*, 910 S.W.2d 481 (Tex.Crim.App. 1995,
orig. proceeding)................................... 16

*Chase v. State*, 448 S.W.3d 6 (Tex.Crim.App. 2014)................. 17-18

*Getts v. State*, 155 S.W.3d 153 (Tex.Crim.App. 2005)................. 17-18

*Pitts v. State*, 916 S.W.2d 507 (Tex.Crim.App. 1996)...................... 46

*Prible v. State*, 245 S.W.3d 466 (Tex.Crim.App.), *cert. denied*,
555 U.S. 833, 129 S.Ct. 54, 172 L.Ed.2d 55 (2008)..................... 43, 47

*Rivera v. State*, 89 S.W.3d 55 (Tex.Crim.App. 2002)..................... 44

*State ex rel. Healy v. McMeans*, 884 S.W.2d 772 (Tex.Crim.App. 1994,
orig. proceeding)................................... 16

*Texas Farmers Ins. Co. v. Cooper*, 916 S.W.2d 698 (Tex.App.–El Paso
1996, orig. proceeding)..................................... 16

*Thieleman v. State*, 187 S.W.3d 455 (Tex.Crim.App. 2005)................. 46

*Whitaker v. State*, 160 S.W.3d 5 (Tex.Crim.App.), *cert. denied*,
543 U.S. 864, 125 S.Ct. 194, 160 L.Ed.2d 106 (2004).................... 43, 47

## STATE STATUTES

TEX. CRIM. PROC. CODE art. 38.43(a)................................. 19, 43

TEX. CRIM. PROC. CODE art. 38.43(i)............................... 18, 37

TEX. CRIM. PROC. CODE art. 38.43(j)...................... 20-22, 24-25, 35, 38

TEX. CRIM. PROC. CODE art. 38.43(l)................................. 31

TEX. CRIM. PROC. CODE art. 38.43(m)............................ 20, 25-26

## SESSION LAWS

Act of 2013, 83rd Leg., R.S., ch. 1349, § 3, 2013 Tex.Gen.Laws. 3587.......... 18

## LEGISLATIVE MATERIALS

ENROLLED BILL SUMMARY, Tex. S.B. 1292, 83rd Leg., R.S. (2013)............. 27

HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. S.B. 1292,
83rd Leg., R.S. (May 20, 2013)........................... 27-29, 35, 37, 43

SENATE COMMITTEE REPORT, Texas Senate Committee on
Criminal Justice, Tex. S.B. 1292, 83rd Leg., R.S. (April 11, 2013). .......... 24-26

Tex. S.B. 1292 (introduced version). ...................................... 24

Tex. S.B. 1292 (enrolled version). ............................... 25-26, 28

## STATEMENT OF THE CASE

Luis Solis-Gonzalez, relator, was charged by indictment with capital murder on August 28, 2012. *See* (tab A of relator's petition). On October 17, 2012, the State filed notice of its intent to seek the death penalty. *See* (State's Appendix A). The State subsequently filed, on or about April 22, 2014, a "Motion for DNA Testing by the Texas Department of Public Safety, Crime Laboratory pursuant to T.C.C.P., article 38.40," which the trial court granted. *See* (tabs B-C of relator's petition). On May 13, 2014, the trial court entered a written order setting September 1, 2014, as a deadline for the completion of that DNA testing. *See* (tab D of relator's petition). On June 5, 2014, the DPS lab advised the trial court by letter that it would be unable to complete the DNA testing by the court-ordered deadline and requested an extension of time until June 1, 2015, to complete the testing. *See* (tab E or relator's petition).

On June 25, 2014, the trial court advised the parties of its intent to have a pretrial hearing to determine the applicability of article 38.43, to address whether the Legislature considered the delays the recent amendments to article 38.43 would cause the DPS lab, and to consider how those amendments would affect the "...Speedy Trial rights of the accused and the State[.]" *See* (tab F of relator's petition). The trial court held this pretrial article 38.43 hearing on October 2,

2014, during which it heard evidence and argument. *See generally* (State's Appendix B – reporter's record of the October 2, 2014, hearing). In a letter to the defense on October 6, 2014, the trial court requested that the defense identify any necessary piece of evidence it believed the State failed to submit for testing and to provide the justification for such testing. *See* (State's Appendix C). The record is devoid of the defense's response to this request.

On January 9, 2015, the trial court entered a written order opining that article 38.43 "...did not mandate that every single piece of evidence seized by law enforcement in a [death-penalty case] must be forensically analyzed" and that the evidence presented by the State at the October 2, 2014, hearing, showing the DNA results of evidence that had already been tested, demonstrated "...substantial compliance with the intent of the statute." *See* (tab G of relator's petition). Explaining that Solis-Gonzalez had been instructed to identify any necessary piece of evidence the State failed to submit for analysis and the justification for such testing and that Solis-Gonzalez's response did not warrant further delay of his trial, the trial court ordered that Solis-Gonzalez's trial setting remain on the court's docket for May 8, 2015.

Alleging that the trial court violated a ministerial duty by refusing to delay his trial setting until after the DPS lab completed its DNA testing of all the evidence submitted by the State, Solis-Gonzalez now seeks mandamus relief from this Court.

## STATEMENT OF FACTS

The indictment in this case alleged that Solis-Gonzalez committed capital murder by intentionally and knowingly causing the deaths of Marysol Saldivar, Eric DeSantiago, and C.H. during the same criminal transaction. *See* (tab A of relator's petition). Specifically, the indictment alleged that Solis-Gonzalez caused Saldivar's death by striking her about the head with an unknown object, that he caused DeSantiago's death by striking him about the head with an unknown object and by stabbing him about the body with a knife, and that he caused C.H.'s death by strangling her with a ligature. *See* (tab A of relator's petition).

In its initial motion for DNA testing, the State requested that the trial court order the DPS lab to "...test all items of evidence submitted by the El Paso Police Department containing biological evidence for DNA comparison, pursuant to T.C.C.P. Article 38.43." *See* (tab B of relator's petition). In granting the State's motion, the trial court ordered the DPS lab to "...test all items submitted by the El Paso Police Department containing biological evidence for DNA comparison." *See* (tab C of relator's petition). The State's motion and the trial court's order do not indicate that the State and the defense conferred, and agreed, about what evidence contained biological material or that the trial court determined that any

1

evidence the State submitted for testing constituted biological evidence required to be tested under article 38.43.

In the trial court's May 13, 2014, order setting a deadline for the completion of that DNA testing, the trial court, first noting that it had previously granted the State's motion for DNA testing, further ordered that "...all DNA testing in reference to [this case] be completed by September 1, 2014." *See* (tab D of relator's petition).

On June 5, 2014, the DPS lab advised the trial court, by letter, that it would be unable to meet the September 1, 2014, deadline, explaining that it lacked the resources to process the "high volume" of evidence it received from the State by the court-ordered deadline. *See* (tab E of relator's petition). The DPS lab requested an extension of time until June 1, 2015, to complete that DNA testing. *See id.*

On June 25, 2014, the trial court advised the parties of its intent to have a pretrial hearing to determine how article 38.43 would be applied in Solis-Gonzalez's case, to address whether the Legislature took into consideration the delays the recent amendments to article 38.43 would cause the DPS lab, and to consider how those amendments would affect the "...Speedy Trial rights of the accused and the State[.]" *See* (tab F of relator's petition). The trial court further

2

advised the parties that it intended to also address the issue of whether "...the State of Texas is required to submit to a laboratory for forensic analysis, every piece of biological evidence they seized at the crime scene." *See id.*

At this pretrial article 38.43 hearing, which was held on October 2, 2014, the prosecutor, during her opening comments, explained that the State had submitted every piece of physical evidence that contained biological material to the DPS lab for DNA testing, but opined that if the State and the defense could not agree on what biological material was actually required to be tested, article 38.43 provided that the trial court hold a hearing to resolve that disagreement. *See* (State's Appendix B at 3-5). Defense counsel agreed with the prosecutor's assertion that the defense was "...asking that all evidence that contained biological material be tested or screened for DNA" and that the parties could not agree on what was required to be tested. (State's Appendix B at 4-5).

Before discussing the results of DNA testing that had been performed up to that point, the prosecutor provided, without objection, a brief recitation of the facts underlying Solis-Gonzalez's capital-murder prosecution. *See generally* (State's Appendix B at 8-11). According to the prosecutor, officers with the El Paso Police Department were dispatched to a residence on Bengal Street on May 31, 2012, where they found three dead victims: (1) Eric DeSantiago, who was found in

3

the kitchen with his face wrapped in duct tape and with burns on his chest, numerous stab wounds, and blunt-force injuries to his head, (2) Marysol Saldivar, who was found in the living room with blunt-force injuries to her head and stab wounds, and (3) thirteen-year-old C.H., who was found in her upstairs bedroom with a slight ligature mark on her neck and who was later determined to have died from ligature strangulation. (State's Appendix B at 9-10).

The prosecutor related that after Solis-Gonzalez murdered his three victims, he went to Mexico, taking Saldivar's truck and his biological four-year-old son, L.S.., who had been present during the murders, and that Solis-Gonzalez dropped L.S. off with his (Solis-Gonzalez's) parents before leaving. (State's Appendix B at 10-11). The prosecutor further related that Solis-Gonzalez had told his parents that he had committed the murders and that Solis-Gonzalez's father then, cooperating with law enforcement, returned L.S. to the United States and told the police that Solis-Gonzalez had confessed to committing the murders. (State's Appendix B at 10).

Solis-Gonzalez was ultimately apprehended at the United States-Mexico border, where he turned himself in. (State's Appendix B at 10). According to the prosecutor, Solis-Gonzalez provided a statement to the police in which he admitted to breaking into the victims' house earlier in the day and to later

4

murdering DeSantiago and Saldivar. (State's Appendix B at 10-11). The prosecutor related that Solis-Gonzalez admitted to tying C.H. up in L.S.'s room, but denied killing her. (State's Appendix B at 11).

In summarizing the major categories of evidence collected, the prosecutor explained that evidence had been collected from the Bengal Street home where the murders occurred, that L.S.'s clothes had been collected when he was returned to the United States, that evidence was collected from Saldivar's truck, that Solis-Gonzalez's clothes were collected when he turned himself in, and that evidence was collected during the autopsies of the three victims. (State's Appendix B at 11-12). The prosecutor further advised the trial court that Nicholas Ronquillo, the DNA section supervisor and technical leader for the El Paso DPS lab, had represented to both her and defense counsel that the DPS lab was about halfway through the DNA testing requested by the State. (State's Appendix B at 23).

The prosecutor then set out some of the DNA results the State had received to date and provided photographs, the crime-scene video, and DPS lab reports, as well as a spreadsheet setting out the DNA results, to the trial court for review. (State's Appendix B at 5-8,12-14, 49-51); (State's Appendices D-L). Specifically, the prosecutor presented, in relevant part, the following specific DNA results,

which are set out below by EPPD evidentiary number, the description of the item from which swabs were taken, and the DNA results:

JE-02: Blood on handle of kitchen knife on kitchen counter at crime scene = mix of DNA from Solis-Gonzalez and DeSantiago. Blood on blade of kitchen knife on kitchen counter = mix of DNA from DeSantiago and low level of data on other component of mixture (State's Appendix B at 14); (State's Appendices E-G).

JE-69: Blood on blade of knife in upstairs restroom = mix of DNA from Solis-Gonzalez and DeSantiago. Blood on handle of knife in upstairs restroom = mix of DNA from Solis-Gonzalez and DeSantiago (State's Appendix B at 14); (State's Appendices E-G).

JE-04: Blood on handle of broken knife on kitchen floor = mix of DNA from Solis-Gonzalez and DeSantiago (State's Appendix B at 15); (State's Appendices E-G).

JE-38: Blood on blade of broken knife on kitchen floor = DNA from DeSantiago (State's Appendix B at 15); (State's Appendices E-G).

JE-72: Blood on pair of girl's blue jeans found in C.H.'s bedroom = DNA from Solis-Gonzalez (State's Appendix B at 15); (State's Appendices E-G).

5208670: Stain on Solis-Gonzalez's right tennis shoe collected when he was arrested = mix of DNA from DeSantiago and Saldivar (State's Appendix B at 15-16); (State's Appendices E-G).

MM01: Stain on Micky Mouse baseball cap collected from L.S. = DNA from Saldivar (State's Appendix B at 16); (State's Appendices E-G).

JE113: Bloody tissue found inside Saldivar's truck in which Solis-Gonzalez fled = DNA from DeSantiago (State's Appendix B at 16); (State's Appendices E-G).

BM01:   Stain on Solis-Gonzalez's jeans collected when he was arrested = mix of DNA from Solis-Gonzalez and DeSantiago (State's Appendix B at 16); (State's Appendices E-G).

JE17:   Blood on piece of toilet paper found on Saldivar's crotch area = mix of DNA with Solis-Gonzalez as a contributor. (State's Appendix B at 16-17); (State's Appendices E-F, H).

JE24:   Blood on piece of duct tape from upstairs bath tub = mix of DNA from Solis-Gonzalez and DeSantiago (State's Appendix B at 17-18); (State's Appendices E-F, H).

JE20:   First stain on piece of duct tape found in hamper = mix of DNA from Solis-Gonzalez and DeSantiago. Second stain on piece of duct tape found in hamper = mix of DNA from Solis-Gonzalez, C.H., DeSantiago, Saldivar, and L.S. (State's Appendix B at 18); (State's Appendices E-F, H).

JE30:   Stain on piece of duct tape found in L.S.'s room = mix of DNA from Solis-Gonzalez and DeSantiago (State's Appendix B at 18); (State's Appendices E-F, H).

JE28:   Stain on piece of duct tape found in bag of toys in L.S.'s room = mix of DNA from Solis-Gonzalez, DeSantiago, Saldivar, C.H., and L.S. (State's Appendix B at 18); (State's Appendices E-F, H).

JE34:   Stain on "makeshift finger cast" next to vacuum outside of upstairs restroom = mix of DNA from Solis-Gonzalez and DeSantiago. (State's Appendix B at 18-19); (State's Appendices E-F, H).[1]

JE66:   Stain from "finger splint" found in C.H.'s bedroom next to her bed = DNA from Solis-Gonzalez (State's Appendix B at 19); (State's Appendices E-F, H).

---

[1] The prosecutor explained that these "makeshift finger casts" appeared to have been an effort by Solis-Gonzalez to bandage the cuts he sustained on his fingers while stabbing the victims. (State's Appendix B at 16-17).

JE70:       Stain from tennis shoe with missing shoelace found in L.S.'s room =
            DNA from DeSantiago (State's Appendix B at 19); (State's
            Appendices E-F, H).[2]

JE22:       Stain on white shirt from upstairs restroom floor = DNA from
            DeSantiago. Stain on collar of white shirt from upstairs restroom
            floor = mix of DNA with Solis-Gonzalez as a contributor (State's
            Appendix B at 19-21); (State's Appendices E-F, H).

JE99:       Stain from duct tape from DeSantiago's head = DNA from
            DeSantiago. Stain from rag removed from DeSantiago's head = DNA
            from DeSantiago. (State's Appendix B at 21); (State's Appendices E-
            F, H).

JE78:       Blood from right-hand fingernail clippings from C.H. = mix of DNA
            from Solis-Gonzalez and C.H. (State's Appendix B at 22); (State's
            Appendices E-F, H).

5208670:    Stain on Solis-Gonzalez's left tennis shoe collected when he was
            arrested = DNA from DeSantiago (State's Appendix B at 22); (State's
            Appendices E-F, H).

BM03:       Stain from Solis-Gonzalez's black shirt collected when arrested =
            DNA from Saldivar (State's Appendix B at 22); (State's Appendices
            E-F, H).

The remaining evidence listed on the State's spreadsheet and mentioned at

the hearing, and for which the State presented the results of any DNA analysis, did

not serve to establish another individual as the perpetrator, nor did that evidence

serve to exclude Solis-Gonzalez as the perpetrator. *See generally* (State's

_____

[2] The prosecutor explained that Solis-Gonzalez confessed to tying C.H. up with shoelaces
and that a bloody shoelace was found in the same drawer with one of the bloody knives. (State's
Appendix B at 15).

Appendix B at 15-16, 21); (State's Appendices E-H). The State also presented lab reports indicating the items from which the analysts were unable to detect the presence of biological material. *See generally* (State's Appendices E-L).

After the State's proffer of the foregoing evidence, the prosecutor explained to the trial court that, in an attempt to comply with the recent amendments to article 38.43, which mandated the DNA testing of biological evidence in a death-penalty case and because there had been no initial agreement between the State and the defense on what items to test, she had submitted a total of 206 items of evidence to the DPS lab for analysis. (State's Appendix B at 23). The State then argued that article 38.43 did not mandate the testing of every single piece of evidence that contained biological material, that the State's submission of 206 items of evidence had overburdened the DPS lab and delayed the trial, and that because all of the significant items of evidence had already been tested and all of the DNA results thus far pointed to Solis-Gonzalez as the perpetrator who murdered the three victims, the trial court could make the determination as to whether there were any remaining untested items that were required to be tested. (State's Appendix B at 23-27, 40, 42-45).

When the trial court asked the prosecutor how she determined what items of evidence to submit for testing, she explained that because she had believed the

new amendments to article 38.43 required the testing of all items that could possibly contain biological material, she had submitted all the evidence that could conceivably contain biological material, regardless of whether that biological material was readily apparent. (State's Appendix B at 27-28).

The State then presented the testimony of Nicholas Ronquillo, the DNA section supervisor and technical leader for the El Paso DPS lab, who testified regarding some of the challenges the lab faced in attempting to comply with requests for DNA testing pursuant to the recent amendments to article 38.43. (State's Appendix B at 29-30). Specifically, Ronquillo explained that with its two qualified DNA analysts, the DPS lab lacked sufficient personnel to process large requests in a reasonable amount of time, that DNA analysis was very expensive, and that the DPS lab did not perform touch-DNA testing because there was typically not enough biological material to analyze with their equipment. (State's Appendix B at 31-33).

Ronquillo agreed with the prosecutor that she had requested that the DPS lab "...take a swab from almost every piece of evidence in this case...," which the prosecutor explained was to ensure that every piece of evidence that could conceivably yield biological evidence was submitted for testing. (State's Appendix B at 33). Ronquillo explained that the DPS lab was using its logic,

reasoning, training, and skills to make a determination as to whether it needed to collect swabs for touch-DNA. (State's Appendix B at 33). When asked by the trial court how long it would take for the DPS lab to process all 206 items of evidence submitted by the State, Ronquillo testified that he projected that the lab would be able to complete the analysis by June of 2015. (State's Appendix B at 33-34).

During arguments, defense counsel argued that because the State only sought DNA testing to strengthen its own case and because a defendant in a death-penalty case was "...entitled to have a complete defense...," the defendant had "...an absolute right to have all the evidence tested," regardless of any delay in the proceedings and the costs incurred by the State for such testing. (State's Appendix B at 36-40). Defense counsel further argued that although "[t]here [was] a reference for identification...," the DNA testing required by article 38.43 was not limited to only issues related to the identity of the perpetrator and even extended to assist the defendant in finding mitigating evidence. (State's Appendix B at 38-39).

Defense counsel offered to tell the trial court in "...an ex parte fashion the defensive reasons of why we believe all the evidence is important because the State of Texas is not entitled to know that..." and argued that "...unless all the

11

evidence is tested...," Solis-Gonzalez would be deprived of exculpatory and mitigating evidence. (State's Appendix B at 38-39). Defense counsel requested that the trial court delay Solis-Gonzalez's trial until after DPS completed its DNA testing of the State's evidence. (State's Appendix B at 39).

When the trial court raised the concern of Solis-Gonzalez' speedy-trial rights in light of his lengthy pretrial incarceration, defense counsel asserted that Solis-Gonzalez waived any speedy-trial claim. (State's Appendix B at 46-47). In turn, the prosecutor argued that although the defendant's rights were important, the State also had the right not to have its cases delayed by unnecessary DNA testing. (State's Appendix B at 47-48).

At the conclusion of the hearing, defense counsel advised the trial court that after he reviewed the evidence tendered by the State, he would then "...add a supplement of what I believe is relevant and give [the prosecutor] an opportunity to what I'm giving this Court..." because he did not "...believe that what [the prosecutor] is going to tender to the Court is going to be what I believe should be all inclusive encompassing of what we believe why we're asking all the DNA evidence to be tested." (State's Appendix B at 51).[3] In a letter to the defense on

---

[3] In his mandamus petition, Solis-Gonzalez claims that "[d]uring the pretrial hearing, Relator produced photographs for Respondent to review in camera of 158 items collected by the El Paso Police Department as biological material and requested all biological evidence be tested

12.

October 6, 2014, the trial court requested that the defense identify to the trial court any necessary piece of evidence it believed the State had failed to submit for DNA testing and to provide the justification for such testing. *See* (State's Appendix C).

On January 9, 2015, the trial court entered a written order opining that article 38.43 "...did not mandate that every single piece of evidence seized by law enforcement in a [death-penalty case] must be forensically analyzed" and that the evidence presented by the State at the October 2, 2014, hearing, showing the DNA results of evidence that had already been analyzed, demonstrated "...substantial compliance with the intent of the statute." *See* (tab G of relator's petition). Explaining that Solis-Gonzalez had been instructed to identify any necessary piece of evidence the State failed to submit for DNA testing and the justification for that testing and that Solis-Gonzalez's response did not warrant further delay of his trial, the trial court ordered that Solis-Gonzalez's trial setting remain on the court's docket for May 8, 2015. *See* (tab G of relator's petition).

Although the record of the pretrial hearing indicates the understanding that Solis-Gonzalez would be making some type of proffer to the trial court, reflecting the necessity of testing all of the State's evidence, (State's Appendix B at 51), and

---

pursuant to Respondent's April 23rd order and Article 38.43(i)." *See* (relator's petition at 5, 10). This claim is unsupported by the reporter's record of the October 2, 2014, pretrial article 38.43 hearing, as there appears to have been no such proffer made by the defense.

13

although the trial court's January 9, 2015, order seems to imply that some type of response or proffer was made to the trial court, *see* (tab G of relator's petition), that proffer does not appear in the record, and Solis-Gonzalez has not provided any such proffer as part of the record for his mandamus petition.

## STATE'S RESPONSE TO RELATOR'S PETITION

Article 38.43 only mandates the testing of biological evidence as defined by subsection (a), and the trial court is afforded discretion as the "gatekeeper" in determining whether the State has rebutted the presumption that any biological material the defendant requests to be tested constitutes biological evidence required to be tested. In this case, the trial court's initial order granting the State's request for DNA testing did not constitute a determination that the evidence the State sought, on its own initiative, to be tested was biological evidence required to be tested under subsection (i). Additionally, the record is devoid of any specific request by Solis-Gonzalez for DNA testing of certain untested biological material. But even assuming, *arguendo*, that Solis-Gonzalez made any such a request, the State sufficiently rebutted any presumption that there existed untested biological material that constituted biological evidence required to be tested. Consequently, the trial court did not abuse its discretion, or violate a ministerial duty, in determining that, in the absence of biological evidence required to be tested, it would not further delay Solis-Gonzalez's trial.

## ARGUMENT AND AUTHORITIES

In his sole issue in his petition for writ of mandamus, Solis-Gonzalez asserts that the trial court "...abused his discretion by ordering the Defendant to proceed to trial for a capital offense before the Texas Department of Public Safety performs DNA testing of biological evidence collected as part of the investigation for the offense." *See* (relator's petition at ii).

### I.    Mandamus standard in criminal cases

Because a writ of mandamus is an extraordinary remedy, it is available only when the relator is able to make two showings: first, there must be no other

adequate remedy at law to redress the alleged harm; and second, the act the relator seeks to compel must be ministerial, rather than discretionary, in nature. *See, e.g., Board of Pardons and Paroles ex rel. Keene v. Court of Appeals for the Eighth District*, 910 S.W.2d 481, 483 (Tex.Crim.App. 1995, orig. proceeding); *State ex rel. Healy v. McMeans*, 884 S.W.2d 772, 774 (Tex.Crim.App. 1994, orig. proceeding); *Bennett v. Paxson*, 932 S.W.2d 81, 82 (Tex.App.–El Paso 1996, orig. proceeding). In regard to the second element, an act is ministerial in nature if the law clearly spells out the duty to be performed with such certainty that nothing is left to the exercise of discretion or judgment, that is, the relator has a clear right to the relief sought, and the facts and the law permit the trial court to make but one decision. *See State ex rel. Healy v. McMeans*, 884 S.W.2d at 774; *Texas Farmers Ins. Co. v. Cooper*, 916 S.W.2d 698, 700 (Tex.App.–El Paso 1996, orig. proceeding).

II.     **Article 38.43 only mandates the testing of biological evidence as defined by subsection (a), and the trial court is afforded discretion as the "gatekeeper" in determining whether the State has rebutted the presumption that any biological material the defendant requests to be tested constitutes biological evidence required to be tested.**

In his mandamus petition, Solis-Gonzalez asserts that once the trial court granted the State's own initial motion for DNA testing, the trial court lacked any discretion to later determine that article 38.43 did not require DNA testing of all

the items submitted by the State to the DPS lab and that the trial court had a ministerial duty to delay Solis-Gonzalez's trial until the DNA testing of all the physical evidence the State submitted for testing was complete. *See* (relator's petition at 8); *see also* (tab G of relator's petition). Solis-Gonzalez further asserts that "...the statute does not permit the trial court exercise [sic] any discretion or deviate from the mandate that any biological evidence shall be required testing [sic] before a defendant a [sic] tried for a capital offense." *See* (relator's petition at 9).

## A. The plain meaning of article 38.43(a), (i), and (j)

A determination of whether the trial court violated any ministerial duty or abused its discretion in this case should begin with a review of the provisions of article 38.43 that are applicable to this case in order to determine which provisions are permissive and which are mandatory. When discerning the meaning of a statute, the reviewing court should begin with its plain language. *See Getts v. State*, 155 S.W.3d 153, 155 (Tex.Crim.App. 2005). If that language is clear and unambiguous, the plain meaning of those words is applied. *See Chase v. State*, 448 S.W.3d 6, 11 (Tex.Crim.App. 2014); *Getts*, 155 S.W.3d at 155. But if the plain language leads to absurd results that the Legislature could not possibly have intended, or if the language is ambiguous, the reviewing court may consider extra-

17

textual factors to determine the statute's meaning. *See Chase*, 448 S.W.3d at 11; *Getts*, 155 S.W.3d at 155.

Subsection (i) of article 38.43, which became effective on September 1, 2013, provides that:

> Before a defendant is tried for a capital offense in which the state is seeking the death penalty, subject to Subsection (j), the state shall require either the Department of Public Safety through one of its laboratories or a laboratory accredited under Section 411.0205, Government Code, to perform DNA testing, in accordance with the laboratory's capabilities at the time the testing is performed, on any biological evidence that was collected as part of an investigation of the offense and is in the possession of the state. The laboratory that performs the DNA testing shall pay for all DNA testing performed in accordance with this subsection. *See* TEX. CRIM. PROC. CODE art. 38.43(i); *see also* Act of 2013, 83rd Leg., R.S., ch. 1349, § 3, 2013 Tex.Gen.Laws. 3587.

A literal reading of subsection (i) mandates the DNA testing of "biological evidence," as that term is specifically defined in article 38.43, in a death-penalty case. *See* art. 38.43(i). At no point, however, does subsection (i) require that the State have DPS test *any and all physical evidence* seized by law enforcement. Rather, subsection (i) only requires DNA testing of any *biological evidence* that was collected as part of the investigation of the offense and is in possession of the State. *See* art. 38.43(i) (emphasis added).

*Biological evidence*, in the context of article 38.43, is not merely any

*biological material*, and article 38.43 does not use those terms synonymously.

Subsection (a) of article 38.43 specifically defines biological evidence as follows:

> (a) In this article, "biological evidence" means:
>     (1) the contents of a sexual assault examination kit; or
>     (2) any item that contains blood, semen, hair, saliva, skin tissue, fingernail scrapings, bone, bodily fluids, or other identifiable biological material that was collected as part of an investigation of an alleged felony offense or conduct constituting a felony offense that might reasonably be used to:
>         (A) establish the identity of the person committing the offense or engaging in the conduct constituting the offense; or
>         (B) exclude a person from the group of persons who could have committed the offense or engaged in the conduct constituting the offense. *See* TEX. CRIM. PROC. CODE art. 38.43(a).

Thus, the plain language of article 38.43(i) does not mandate the testing of

all physical evidence or even all biological material collected during an

investigation. Rather, subsection (i) only requires DNA testing of biological

evidence as defined by subsection (a), that is, evidence that constitutes identifiable

biological material that might reasonably be used to establish the identity of the

perpetrator or exclude a person, presumably the defendant, from the group of

persons who could have committed the offense.[4]

---

[4] A defendant who is unable to show that certain biological material constitutes biological evidence that is required to be tested, that is, biological material that goes to the identity of the perpetrator, is not without recourse. Subsection (m) of article 38.43 provides that:

19

But while subsection (i) imposes a mandatory requirement that any biological evidence, as that term is specifically defined, collected during an investigation be submitted for DNA testing, subsection (j) of article 38.43 designates the trial court as the "gatekeeper" to make the threshold determination of whether the biological material sought to be tested by the defendant actually constitutes biological evidence required to be tested: "...If the state and the defendant do not agree on which biological materials qualify as biological evidence, the state or the defendant may request the court to hold a hearing to determine the issue." *See* TEX. CRIM. PROC. CODE art. 38.43(j). In other words, in the event that the parties, after conferring with one another, cannot agree on what biological materials constitute biological evidence that is required to be tested, the parties may request a hearing, at which the trial court exercises its discretion in deciding the issue. *See* art. 38.43(j).

---

On an ex parte showing of good cause to the court, a defendant may have [an accredited] laboratory...perform testing of *any biological material that is not required to be tested under Subsection (i)*. The defendant is responsible for the cost of any testing performed under this subsection. *See* TEX. CRIM. PROC. CODE art. 38.43(m) (emphasis added).

As will be discussed below, the addition of this provision is an indication that the Legislature made a distinction between biological material and biological evidence and intended that the evidence required to be tested under subsection (i) constitute more than mere biological material, since subsection (m) recognizes that there may exist biological material that does *not* constitute biological evidence as defined by subsection (a).

20

And in making this determination of whether the biological material sought to be tested constitutes biological evidence required to be tested, there are, at the very least and in the context of this case, two findings that the trial court must first make, according to the plain language of subsection (j). Specifically, subsection (j) provides that "[a]t the hearing, there is a rebuttable presumption that the biological material that the defendant requests to be tested constitutes biological evidence that is required to be tested under Subsection (i)." *See* TEX. CRIM. PROC. CODE art. 38.43(j). Because all of the State's physical evidence will not necessarily contain biological material, and because the plain language of subsection (j) only permits the defendant to request the testing of *biological material*, the defendant must first lodge a specific enough request that, at the very least, alleges, or in some manner identifies, the *biological material* sought to be tested or otherwise articulates that any specific evidence he does identify constitutes or contains biological material. *See id.* In other words, global requests that all of the physical evidence in the State's possession be tested, regardless of whether that evidence actually contains or constitutes biological material, are insufficient to put the trial court or the State on notice of the specific biological material the defendant wants to test or to invoke the rebuttable presumption that

21

the specific biological material constitutes biological evidence required to be tested.

In the absence of a specific request by the defendant to test any certain biological material, the State is in no position to rebut any presumption that certain biological material sought to be tested constitutes biological evidence as defined by subsection (a) because the defendant never actually lodged a specific request for the testing of that biological material. Similarly, the trial court cannot make a determination that certain biological material constitutes biological evidence because the trial court has not been advised by the defendant as to what biological material he believes constitutes biological evidence required to be tested. Thus, according to the plain language of subsection (j), the trial court must determine, before the State is required to rebut any presumption at the pretrial hearing, whether the defendant lodged a specific enough request of testing of certain identifiable biological material. *See* art. 38.43(j).

Additionally, the plain language of subsection (j) provides that if the defendant does make a request for the testing of certain biological material, the presumption that that biological material is biological evidence required to be tested is one that may be rebutted by the State at the pretrial hearing. *See* art. 38.43(j). Thus, in addition to making a finding as to whether the defendant made a

sufficiently specific request to test certain identifiable biological material, the trial court must determine whether the State has sufficiently rebutted any presumption that any specific biological material for which the defendant requested testing constitutes biological evidence as defined by subsection (a). And as previously stated, the trial court is the designated gatekeeper in making the determination of whether the State has sufficiently rebutted that presumption.

For all the foregoing reasons, the plain language of article 38.43 only mandates the testing of biological evidence as defined by subsection (a), and the trial court is afforded discretion as the gatekeeper in determining whether the State has rebutted the presumption that any specific biological material the defendant requests to be tested constitutes biological evidence required to be tested under subsection (i).

**B.    The legislative intent of the recent amendments to article 38.43**

The foregoing interpretation, that article 38.43 only mandates the testing of biological evidence as defined by subsection (a) and that the trial court is afforded discretion as the gatekeeper in determining whether the State sufficiently rebutted the aforementioned presumption, is consistent with the legislative intent of the recent amendments to article 38.43. Senate Bill 1292, as it was initially introduced, simply proposed to add the following amendment as subsection (i):

23

SECTION 1.  Article 38.43, Code of Criminal Procedure, is amended by adding Subsection (i) to read as follows:

> (i)   Before a defendant is tried for a capital offense in which the state is seeking the death penalty, the Department of Public Safety shall perform DNA testing on all biological evidence that was collected as part of an investigation of the offense.

*See* Tex. S.B. 1292 (introduced version).  The introduced version did not propose to add subsections (j) or (m) now found in article 38.43.  *See id.*

The Senate Committee on Criminal Justice subsequently presented a substitute version of S.B. 1292 that contained language substantially similar to that now found in article 38.43(i) and (j), except that subsection (i) of the substituted version did not reference subsection (j).  *See* SENATE COMMITTEE REPORT, Texas Senate Committee on Criminal Justice, Tex. S.B. 1292, 83rd Leg., R.S. (April 11, 2013).  Unlike the introduced version of the bill, the substitute version proposed to add subsection (j), which differed from that currently found in article 38.43 in that it did not provide for the rebuttable presumption discussed above and instead stated: "At the hearing, a request by the defendant to test biological material is prima facie evidence that the biological material constitutes biological evidence that is required to be tested under Subsection (i)." *Compare* SENATE COMMITTEE REPORT, Texas Senate Committee on Criminal Justice, Tex. S.B. 1292, 83rd Leg., R.S. (April 11, 2013) *with* TEX. CRIM. PROC. CODE art.

24

38.43(j) ("At the hearing, there is a rebuttable presumption that the biological material that the defendant requests to be tested constitutes biological evidence that is required to be tested under Subsection (i).").

Additionally, the substitute version of S.B. 1292 proposed to add subsection (m), which mirrored that subsection as it currently appears in article 38.43:

> A defendant may have another laboratory accredited under Section 411.0205, Government Code, perform additional testing of any biological evidence required to be tested under Subsection (i). On an ex parte showing of good cause to the court, a defendant may have a laboratory accredited under Section 411.0205, Government Code, perform testing of any biological material that is not required to be tested under Subsection (i). The defendant is responsible for the cost of any testing performed under this subsection. *See* TEX. CRIM. PROC. CODE art. 38.43(m); *see also* SENATE COMMITTEE REPORT, Texas Senate Committee on Criminal Justice, Tex. S.B. 1292, 83rd Leg., R.S. (April 11, 2013).

The enrolled version of S.B. 1292, ultimately enacted, contained additional changes to subsections (i) and (j). Specifically, an amendment to subsection (i) provided that the mandate in subsection (i) requiring DNA testing of any biological evidence collected during an investigation of a death-penalty case was subject to the procedures set forth in subsection (j). *See* Tex. S.B. 1292 (enrolled version). Additionally, the original language in subsection (j) providing that a defendant's request to test biological material was "...prima facie evidence that the biological material constitutes biological evidence that is required to be tested

25

under Subsection (i)" was changed to provide that there is a presumption, that may be rebutted by the State, that biological material a defendant requests to be tested constitutes biological evidence that is required to be tested. *See* SENATE COMMITTEE REPORT, Texas Senate Committee on Criminal Justice, Tex. S.B. 1292, 83rd Leg., R.S. (April 11, 2013); *see also* Tex. S.B. 1292 (enrolled version).

That the Legislature intended to make a distinction between evidence that is simply biological material and biological evidence that is required to be tested is thus reflected not only in the plain language of subsections (a), (i), and (j), which expressly make that distinction, but also by the addition of subsection (m), which provides a defendant in a death-penalty case with the means to request pretrial testing of biological materials that do not constitute biological evidence required to be tested under subsection (i). *See* Tex. S.B. 1292 (enrolled version). By its very language, subsection (m) recognizes that there may exist biological material that does *not* constitute biological evidence required to be tested, supporting the conclusion that the Legislature intended biological evidence required to be tested under subsection (i) to not be merely any biological material, but rather, biological material that goes to the issue of the identity of the perpetrator. *See* Tex. S.B. 1292 (enrolled version); *see also* TEX. CRIM. PROC. CODE art. 38.43(m) (providing that a defendant may have an accredited laboratory perform testing of any

26

biological material that is not biological evidence required to be tested under subsection (i)).[5]

Additionally, that the Legislature intended the required DNA testing of biological evidence in subsection (i) be subject to the procedures outlined in subsection (j), in which the trial court acts as the gatekeeper in determining what biological material actually constitutes biological evidence, is demonstrated by the amendment expressly providing that subsection (i) was "subject to" the procedures outlined in subsection (j) and is reflected in the bill's analysis, which explains that "[t]he bill would establish a process to determine what evidence fell under this requirement [that the DPS lab perform DNA testing on any biological evidence collected during the investigation]." *See* HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. S.B. 1292, 83rd Leg., R.S. (May 20, 2013); *see also* ENROLLED BILL SUMMARY, Tex. S.B. 1292, 83rd Leg., R.S. (2013) ("The bill establishes procedures for determining which biological materials collected as part of the investigation qualify as biological evidence that is required to be tested, including

---

[5] To any extent that Solis-Gonzalez's request for DNA testing was to develop mitigating evidence, such a request, which would fall under subsection (m), is not governed by subsections (i) and (j), and mandamus is not the proper remedy for the trial court's denial of such a request under subsection (l).

procedures relating to a hearing if the state and the defendant do not agree on that qualification....").

The addition of subsection (j), with its requirement that the initiation of DNA testing occur "[a]s soon as practicable after the defendant is charged with a capital offense...," as well as the provisions that the trial court hold a hearing to resolve disputes as to what constitutes biological evidence and that the State may rebut any presumption that biological material in its possession constitutes biological evidence, *see* Tex. S.B. 1292 (enrolled version), appears to be an attempt by the Legislature to allay the concerns of the bill's opponents. Echoing the concerns of the State and the trial court in this case regarding the potential consequences of allowing or requiring DNA testing without reasonable limitations, opponents of the bill opined that the bill, as amended, "...could result in unnecessary DNA testing being used as a delaying tactic in death penalty trials." *See* HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. S.B. 1292, 83rd Leg., R.S. (May 20, 2013).

Opponents further recognized that:

With SB 1292 testing could be requested of numerous–in some cases hundreds–of items or samples. These items, while gathered from the crime scene, may have nothing to with the identity of the criminal and the results of the testing might not yield any relevant results. This could delay trials and increase costs, without adding information about the crime.

*See id.* And consistent with the dilemma experienced by the DPS lab in the present case, opponents recognized that "[i]t could be difficult for crime labs to absorb the additional testing required by SB 1292 within existing resources." *See id.*

In turn, the bill's supporters explained that:

SB 1292 would ensure that its provisions were not used only as an unreasonable delaying tactic. As soon as practicable, courts would have to order the defense and prosecution to meet to confer about what should be tested. If there was disagreement over what should be tested, either party could request a hearing. The judge holding the hearing would act as a gatekeeper to consider a defendant's request. The presumption that a request for testing would be done would be rebuttable by the prosecution. *See id.*

Ultimately, the legislative history of the recent amendments to article 38.43 reflects that while the Legislature imposed a mandatory requirement for DNA testing of biological evidence in a death-penalty case "...to help ensure that only the guilty faced execution," other provisions designed to impose some limits on that testing were added in order to "...balance and protect the needs and rights of defendants and the state in death penalty cases." *See id.* The legislative history supports the conclusion that while the Legislature intended to impose a mandatory requirement that biological evidence in a death-penalty case be subject to DNA testing, the trial court is vested with the authority and the discretion to act as the

29

demonstrated to this Court his entitlement to mandamus relief for an alleged violation of that article. The Legislature has expressly provided that a defendant's exclusive remedy for testing that was not performed as required under subsection (i) or (j) is to seek a writ of mandamus from this Court. *See* art. 38.43(l).

The only remaining question, then, is whether Solis-Gonzalez has presented this Court with a sufficient record demonstrating that the trial court violated a ministerial duty when it refused to delay Solis-Gonzalez's trial for further DNA testing.

As will be discussed below, the record reflects that the complained-of incomplete DNA testing was in relation to testing initiated by the State on its own motion and was not based on any determination by the trial court that that evidence for which the State initially sought testing was biological evidence required to be tested under subsection (i). Additionally, the record before this Court is devoid of a specific request by Solis-Gonzalez identifying as-of-yet untested biological material, and the State sufficiently rebutted any presumption at the pretrial hearing that there existed untested biological material that constituted biological evidence required to be tested, such that the trial court did not abuse its discretion in determining that there existed no untested biological evidence required to be tested. Consequently, Solis-Gonzalez has failed his burden of

31

"gatekeeper" in determining what biological material sought to be tested by the defendant actually constitutes biological evidence. In other words, contrary to what Solis-Gonzalez suggested at the pretrial hearing and in his mandamus petition, there is no automatic entitlement to DNA testing of all biological materials or all evidence in the State's possession. Rather, a defendant's entitlement to mandatory DNA testing under subsection (i) is based upon the satisfaction of certain conditions, and the trial court is afforded the discretion to determine whether those conditions have been met.

For the following reasons, the trial court did not abuse its discretion as the gatekeeper in determining that Solis-Gonzalez failed to demonstrate the existence of biological evidence required to be tested because he failed to make a specific request for the testing of certain biological material, and because the State sufficiently rebutted any presumption that any biological material Solis-Gonzalez sought to be tested constituted biological evidence, such that Solis-Gonzalez has failed to demonstrate his entitlement to mandamus relief.

III.  **Solis-Gonzalez has failed his burden of demonstrating his entitlement to mandamus relief for an alleged violation of article 38.43(i) and (j).**

After determining which provisions of article 38.43 are mandatory and which are permissive, the issue then becomes whether Solis-Gonzalez has

30

proving that the trial court violated a ministerial duty when it determined that, in the absence of untested biological evidence required to be tested under article 38.43(i), Solis-Gonzalez's case could proceed to trial as scheduled.

A. **Where the trial court's initial order granting the State's request for DNA testing did not constitute a determination that the evidence the State sought to be tested was biological evidence required to be tested under subsection (i), and where the record before this Court is devoid of a specific request by Solis-Gonzalez for DNA testing of certain untested identifiable biological material, the trial court did not abuse its discretion, or violate a ministerial duty, in refusing to delay his trial.**

In his mandamus petition, Solis-Gonzalez alleged that the trial court violated a ministerial duty when it refused to delay Solis-Gonzalez's trial until the DPS lab completed its DNA analysis of biological evidence required to be tested pursuant to article 38.43(i). Implicit in Solis-Gonzalez's complaint is the assertion that the trial court's initial order granting the State's request for DNA testing constituted a determination that the evidence the State submitted for testing was biological evidence required to be tested under subsection (i). A careful review of the record, however, reflects that the trial court's initial order simply granted the State's initial general and global request to have all of its evidence submitted for DNA testing, but did not purport to determine that that evidence constituted biological evidence required to be tested under article 38.43(i).

32

At the pretrial article 38.43 hearing the trial court ultimately held in this case, the prosecutor explained that, in an attempt to comply with the recent amendments to article 38.43 mandating the DNA testing of biological evidence collected in a death-penalty case, and because there had been no initial agreement between the State and the defense as to what items to test, the prosecutor had submitted for DNA testing every piece of evidence that could have possibly contained biological material, which amounted to approximately 206 items of evidence. (State's Appendix B at 3-5, 23). While the State's motion had requested DNA testing of "biological evidence," *see* (tab B of relator's petition), and the prosecutor suggested at the hearing that all of the items she submitted to the DPS lab contained biological material, the record, and in particular Ronquillo's testimony, shows that the prosecutor also initially submitted for testing items that did not contain readily apparent identifiable biological material out of concern that the failure to do so would somehow violate article 38.43. (State's Appendix B at 27-28, 33).

When the trial court asked the prosecutor at this pretrial hearing how she determined what items of evidence to submit for testing, she explained that, based on a belief that article 38.43 required the testing of items that could possibly contain biological material, she had initially submitted all the State's evidence that

33

could conceivably contain biological material, even where the presence of any biological material was not readily apparent. (State's Appendix B at 27-28). Although the trial court had granted the State's initial request for this expansive DNA testing, there is nothing in the record or the trial court's order to indicate that it based its ruling on a determination that the evidence the State sought to be tested actually constituted biological evidence that was required to be tested under subsection (i). *See* (tab C of relator's petition).

Thus, the record reflects that the State, out of an abundance of caution and on its own initiative, and not as the result of any agreement between the parties, made its own general and global request for DNA testing. The record further reflects that although the trial court, in granting the State's global request for testing, made a reference to article 38.43 and ordered the DPS lab to "...test all items submitted by the El Paso Police Department containing biological evidence for DNA comparison," nothing in that order, or the State's motion, indicates that the State and the defense came to an agreement as to what evidence was required to be tested or that the trial court made an express determination that whatever evidence the State submitted for testing at that time constituted biological evidence that was required to be tested under subsection (i) of article 38.43. *See* (tab C of relator's petition).

Article 38.43(j) expressly provides that subsection (j) "...does not in any way prohibit the state from testing biological evidence in the state's possession," and nothing in that provision suggests that such a request constitutes any kind of finding that whatever evidence the *State*, on its own initiative, seeks to test is biological evidence required to be tested under subsection (i). *See* TEX. CRIM. PROC. CODE art. 38.43(j). The legislative history for this provision indicates that the Legislature specifically intended that "[t]he state would retain the right to test all evidence in its possession." *See* HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. S.B. 1292, 83rd Leg., R.S. (May 20, 2013).

Inherent in the State's right to test evidence in its possession, on its own initiative, is the right to later reassess whether DNA testing of certain evidence is necessary and will yield anything of probative value or whether that testing would simply serve to delay the prosecution or unduly burden the lab performing the testing. In this case, that is what the State did in reassessing its own request for DNA testing, once it became apparent that its broad submission of 206 items of evidence had unnecessarily burdened the DPS lab, that this request for testing had unnecessarily delayed the trial, that all significant items of evidence had already been tested, and that the DNA results of that testing conclusively pointed to Solis-Gonzalez as the sole perpetrator. (State's Appendix B at 23-27, 40, 42-45).

35

And the record reflects that it was in response to the trial court's initial order granting the State's broad request for DNA testing, which included items that did not contain readily apparent biological material, that the DPS lab requested additional time. The DPS lab's request for additional time was not in response to any order issued by the trial court whereby the trial court had determined that the evidence the State initially sought to be tested constituted biological evidence required to be tested under subsection (i) of article 38.43, such that the trial court's decision to proceed with Solis-Gonzalez's trial before the DPS lab had finished that particular testing based on the State's request did not constitute a violation of the requirement in subsection (i) of article 38.43 that any biological evidence be tested before a defendant is tried in a capital death-penalty case.

It appears that given the delay of the trial and the issues encountered by the DPS lab in completing the broad request for testing by the State, the trial court decided to hold a hearing to litigate how article 38.43 would be applied in Solis-Gonzalez's case and allowed the parties to litigate what biological material constituted biological evidence required to be tested under subsection (i). Although the letter the trial court sent to the parties indicated that the pretrial hearing would address whether the State was required to test every piece of

36

"biological evidence," *see* (tab F of relator's petition), the record of the pretrial article 38.43 hearing and the trial court's ultimate order on January 9, 2015, reflect that the parties were litigating the issue of whether *all* of the evidence collected by the State constituted biological evidence required to be tested under subsection (i) of article 38.43. *See* (tab G of relator's petition – where the trial court ruled that "...Article 38.43 does not mandate that *every single piece of evidence seized by law enforcement* in a [death-penalty case] must be forensically analyzed.").[6]

At the pretrial hearing, the prosecutor argued, and the trial court correctly ruled, that article 38.43(i) does not mandate the testing of every single piece of evidence or even all biological material collected by the State during its investigation. *See* art. 38.43(i). As previously discussed, article 38.43(i) only requires DNA testing of biological evidence as defined by subsection (a), that is, evidence that goes to the issue of the identity of the perpetrator. *See id.* And the defendant's entitlement to mandatory testing under article 38.43(i) is predicated on

---

[6] The trial court's concerns, as expressed in its June 25, 2014, letter and at the pretrial hearing, regarding the possibility of unnecessary delays as a result of DNA testing without reasonable limits, were legitimate and consistent with the concerns raised by the opponents of S.B. 1292, in that the new amendments to article 38.43 "...could result in unnecessary DNA testing being used as a delaying tactic in death penalty trials" and that DNA testing without reasonable limitations would result in increased costs and trial delay for DNA testing that yielded no relevant evidence regarding the identity of the perpetrator. *See* HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. S.B. 1292, 83rd Leg., R.S. (May 20, 2013).

the defendant first making a specific request that certain biological material be tested.

The record currently before this Court, including the record of the pretrial hearing, is devoid of any specific request by Solis-Gonzalez identifying as-of-yet untested biological material sought to be tested. At the beginning of the pretrial hearing, defense counsel agreed with the prosecutor's assertion that the defense was "...asking that all evidence that contained biological material be tested or screened for DNA" and that the parties could not agree on what was required to be tested. (State's Appendix B at 4-5). At some point during the hearing, Solis-Gonzalez, before the State was required to put forth any evidence to rebut any presumption, was required to lodge a specific enough request that, at the very least, alleges, or in some manner identifies, the *biological material* sought to be tested or otherwise articulates that any specific evidence he does identify constitutes or contains biological material. *See* art. 38.43(j).

As will be further discussed below, the State presented substantial evidence indicating that the DNA results revealed, and any further testing would likely confirm, that Solis-Gonzalez was the perpetrator who murdered the three victims. In his mandamus petition, Solis-Gonzalez claims, presumably with respect to any as-of-yet untested evidence, that "[d]uring the pretrial hearing, Relator produced

38

photographs for Respondent to review in camera of 158 items collected by the El Paso Police Department as biological material and requested all biological evidence be tested pursuant to Respondent's April 23rd order and Article 38.43(i)." *See* (relator's petition at 5, 10). This claim is unsupported by the reporter's record of the October 2, 2014, pretrial article 38.43 hearing, as there appears to be no such proffer of photographs on the record by the defense. While the record of the pretrial hearing indicates an understanding that Solis-Gonzalez would be tendering some type of proffer to the trial court to reflect the necessity of testing all of the State's evidence, (State's Appendix B at 51), and although the trial court's January 9, 2015, order seems to imply that some type of response or proffer was made to the trial court, *see* (tab G of relator's petition), that proffer does not appear in the mandamus record before this Court, and Solis-Gonzalez has not provided any such proffer as part of his mandamus petition.

To the extent that Solis-Gonzalez made anything resembling a request for testing at the pretrial hearing, he simply advised the trial court that he was entitled to DNA testing of *all* the State's evidence. *See* (State's Appendix B at 36-40, 51). As previously discussed, global requests for all of the State's evidence to be tested for DNA are generally insufficient to put the trial court or the State on notice of the specific biological material the defendant wants to test or to invoke the

39

rebuttable presumption in subsection (j). But even assuming, *arguendo*, that Solis-Gonzalez had tendered photographs of the State's evidence to the trial court as some kind of proffer of what he wanted to be tested, photographs, in and of themselves, do not necessarily reflect the existence of biological material and such tender is not a clear articulation of what specific biological material Solis-Gonzalez wanted to be tested for DNA.

The mandamus record before this Court is simply devoid of a specific request by Solis-Gonzalez identifying as-of-yet untested biological material sought to be tested. In the absence of such a request, the State was not required to rebut any presumption that certain biological material constituted biological evidence that is required to be tested because Solis-Gonzalez never actually made such a request identifying any specific biological material, nor can the trial court determine that there exists biological material that constitutes biological evidence that is required to be tested under subsection (i).

Rather than simply articulate what specific untested biological material he wanted to be tested, Solis-Gonzalez attempted to bootstrap his entitlement to DNA testing of biological evidence off the State's own initial broad request for DNA testing and now complains that the trial court violated a ministerial duty by refusing to delay the trial until after the DPS lab had completed the testing based

on the State's initial request. Solis-Gonzalez was afforded an opportunity during and after the pretrial hearing to make a specific request of what biological material he wanted to be tested, but the record does not reflect what request, if any, was made. Even now, Solis-Gonzalez has not identified in his mandamus petition what specific biological material he wants tested.

In sum, the trial court's initial order granting the State's broad request for DNA testing did not constitute a determination by the trial court that the evidence the State, on its own initiative, sought to test was biological evidence required to be tested under subsection (i). Nothing in article 38.43 then prevented the trial court from later holding a hearing pursuant to subsection (j) to ensure that biological evidence required to be tested under subsection (i) would in fact be tested prior to trial, notwithstanding any ancillary DNA testing by the State on other evidence in its possession.

And the mandamus record before this Court is devoid of a specific request by Solis-Gonzalez for DNA testing of certain identifiable biological material that has not yet been tested. Consequently, the trial court did not abuse its discretion in determining that there existed no other biological evidence required to be tested under subsection (i), and Solis-Gonzalez has thus failed his burden of proving that

41

the trial court violated a ministerial duty by refusing to delay his trial. Solis-Gonzalez's requested mandamus relief should be denied for this reason alone.

**B.    Where the State sufficiently rebutted any presumption that there existed untested biological material that constituted biological evidence required to be tested, the trial court did not abuse its discretion, or violate a ministerial duty, in refusing to delay Solis-Gonzalez's trial.**

In his mandamus petition, Solis-Gonzalez claims that at the pretrial hearing, "...no evidence was presented by the Real Parties in Interest/State to rebut the presumption that the biological material Relator/Defendant requested to be tested constituted biological evidence that is *required* to be tested under subsection (i)." *See* (relator's petition at 11); *see also* (relator's petition at 8 – claiming that the respondent trial court "...reviewed no evidence to rebut the presumption that the biological material that was requested to be tested constituted required testing pursuant to Article 38.43(i)..."). Solis-Gonzalez's claims are not supported by the record, which reflects that the State presented sufficient evidence, in the form of DNA test results of all the significant items of evidence that had already been tested, to rebut the presumption that there existed any other untested biological material that goes to the issue of the identity of the perpetrator.

The plain language of article 38.43 indicates that biological evidence required to be tested focuses only on that evidence that relates to the issue of

42

identity. *See* art. 38.43(a). And, as previously mentioned, the legislative history of the recent amendments to article 38.43 reflects that the Legislature imposed a mandatory requirement of DNA testing of biological evidence in a death-penalty case to ensure that the identity of the perpetrator would be unassailable and that "...only the guilty face[] execution." *See* HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. S.B. 1292, 83rd Leg., R.S. (May 20, 2013).

Courts have generally held that the presence of a third-party's DNA on evidence sought to be tested, without more, does not necessarily constitute exculpatory evidence, particularly when it does not serve to explain away all of the other evidence pointing to the defendant's guilt. *See Prible v. State*, 245 S.W.3d 466, 470 (Tex.Crim.App.) (holding that evidence of another person's DNA in addition to the defendant's was not necessarily exculpatory evidence in light of the additional evidence at trial that established the defendant's guilt), *cert. denied*, 555 U.S. 833, 129 S.Ct. 54, 172 L.Ed.2d 55 (2008); *Whitaker v. State*, 160 S.W.3d 5, 9 (Tex.Crim.App.) (holding that testing of blood on the murder weapon would not be exculpatory since the blood could have belonged to a co-conspirator or the victim and because regardless of whose blood was on the rifle, other evidence at trial established the defendant's guilt, including his statement to a co-conspirator that he had "laid the bitch to rest."), *cert. denied*, 543 U.S. 864, 125 S.Ct. 194, 160

43

L.Ed.2d 106 (2004); *Bell v. State*, 90 S.W.3d 301, 306 (Tex.Crim.App. 2002) (holding that evidence of another person's DNA at the crime scene will not, without more, constitute affirmative evidence of a defendant's innocence).

Likewise, reviewing courts have held that while the presence of a defendant's DNA could indicate a defendant's guilt, the absence of DNA would not necessarily indicate innocence. See *Rivera v. State*, 89 S.W.3d 55, 60 (Tex.Crim.App. 2002) (holding that while the presence of the child-victim's DNA under the defendant's fingernails could indicate guilt, the absence of such DNA would not indicate innocence).

At the pretrial hearing in this case, the State presented DNA results of evidence already tested that shows that the identity of the perpetrator is Solis-Gonzalez and that he cannot be excluded from any group of individuals responsible for the killings. Specifically, the State presented DNA test results that established that a combination of Solis-Gonzalez's and DeSantiago's blood was found on at least three knives, apparently used as the murder weapons, recovered from the scene of the murders. Solis-Gonzalez's blood was also found on items in the Bengal Street home that would demonstrate that he was the individual who murdered the three victims. For example, Solis-Gonzalez's blood was found on a pair of girl's blue jeans in C.H.'s bedroom where C.H. was strangled to death, and

44

his DNA was also found on tissues or "makeshift finger casts" recovered from the crime scene, including one such "finger cast" that was located on Saldivar's crotch area. Solis-Gonzalez's blood was also found underneath C.H.'s fingernails.

Additionally, blood from the victims was found on Solis-Gonzalez's clothing and shoes when he turned himself in, and blood from Saldivar, four-year-old L.S.'s mother, was found on L.S.'s Micky Mouse baseball cap that was collected after Solis-Gonzalez dropped L.S. with his (Solis-Gonzalez's) parents. Moreover, a bloody tissue with DeSantiago's blood was found in Saldivar's truck, the vehicle in which Solis-Gonzalez made his getaway after the murders.

In addition to these DNA results, the State provided the trial court with additional lab reports listing items of evidence containing any untested biological material and items of evidence on which analysts were unable to detect the presence of biological material. *See generally* (State's Appendices E-L). The State also provided photographs and the crime-scene video for the trial court to review in making its determination as to whether there existed other untested biological material that constituted biological evidence required to be tested under subsection (i). (State's Appendix B at 5-8, 12-14, 49-51); (States's Appendices D-L).

The prosecutor further advised the trial court, without objection, that Solis-Gonzalez provided a statement to the police in which he admitted to breaking into the victims' house earlier in the day and later murdered DeSantiago and Saldivar. (State's Appendix B at 11); *see also Thieleman v. State*, 187 S.W.3d 455, 457-58 (Tex.Crim.App. 2005) (holding that undisputed assertions by counsel may be held to have been adoptively admitted by the opposing party if "the event [that is the subject of those assertions] could not have happened without being noticed" and "the assertions [are] of the sort that would provoke a denial by opposing counsel if it were not true"); *Pitts v. State*, 916 S.W.2d 507, 510 (Tex.Crim.App. 1996) ("This Court accepts as true factual assertions made by counsel which are not disputed by opposing counsel.").[7]

The DNA test results presented to the trial court by the State thus far have so almost conclusively established Solis-Gonzalez's identity as the individual who, at the very least, murdered DeSantiago and Saldivar that it is unlikely that there exists any other biological material that would serve to negate that proof. If there is any such evidence, the record is devoid of any request by Solis-Gonzalez to test that biological material.

---

[7] As previously mentioned, while Solis-Gonzalez admitted to tying thirteen-year-old C.H. up in L.S.'s bedroom, he denied killing her. (State's Appendix B at 11).

But even if Solis-Gonzalez had requested the testing of specific biological material, he would have been hard-pressed to demonstrate how that evidence, in light of the strength of the State's proffer, would have served to negate his identity as the killer. As previously discussed, the presence of third-party DNA on other evidence would not serve to exculpate Solis-Gonzalez as the individual who stabbed and beat DeSantiago and Saldivar to death, particularly where his own blood was mixed with DeSantiago's blood on the knives found at the murder scene of the murders, he had the victims' blood on his clothing and shoes, and he confessed to murdering both DeSantiago and Saldivar and admitted tying up C.H. *See, e.g., Prible*, 245 S.W.3d at 470; *Whitaker*, 160 S.W.3d at 9; *Bell*, 90 S.W.3d at 306. And if the evidence requested to be tested by a defendant does not serve to exculpate him of the charged offense, his request for DNA testing of evidence that will not prove to be fruitful can be nothing more than an attempt to unreasonably delay his capital-murder prosecution.

For all the foregoing reasons, the State sufficiently rebutted any presumption that there existed untested biological material that constituted biological evidence required to be tested. Consequently, the trial court did not abuse its discretion in determining that there existed no other biological evidence required to be tested under subsection (i), and Solis-Gonzalez has thus failed his

47

burden of proving that the trial court violated a ministerial duty by refusing to delay his trial. Solis-Gonzalez's requested mandamus relief should be denied for this reason as well.

## IV. Conclusion

The record reflects that, out of an abundance of caution, the State initially made a broad request for DNA testing, which the trial court granted without making any determination that that evidence constituted biological evidence required to be tested. The record reflects that it was in response to this request for testing by the State that the DPS lab requested additional time for DNA testing. That the State exercised its right to test evidence in its own possession did not prohibit it from later reassessing the necessity of testing all of the items it originally submitted. Because the State and the defense did not come to an agreement as to what items of evidence containing biological material constituted biological evidence required to be tested, the trial court held a hearing, during which the parties were permitted to litigate what biological material constituted biological evidence required to be tested under subsection (i) of article 38.43. The mandamus record is devoid of any specific request by Solis-Gonzalez to test certain untested biological material. And the State sufficiently rebutted any presumption that there existed any as-yet untested biological material that

48

constituted biological evidence required to be tested. The trial court properly exercised its discretion as the gatekeeper in determining whether there existed biological material that constituted biological evidence required to be tested under subsection (i), and the trial court did not abuse its discretion in determining that no such evidence existed under the facts of this case. For all the foregoing reasons, Solis-Gonzalez has failed his burden of demonstrating his entitlement to the requested mandamus relief, and his petition for writ of mandamus should be denied.

## PRAYER

WHEREFORE, the State prays that this Court deny relator's application for writ of mandamus.

Respectfully submitted,

JAIME ESPARZA
DISTRICT ATTORNEY
34th JUDICIAL DISTRICT


/s/ Lily Stroud
_____
LILY STROUD
ASST. DISTRICT ATTORNEY
DISTRICT ATTORNEY'S OFFICE
201 EL PASO COUNTY COURTHOUSE
500 E. SAN ANTONIO
EL PASO, TEXAS 79901
(915) 546-2059 ext. 3769
FAX (915) 533-5520
EMAIL lstroud@epcounty.com
SBN 24046929

ATTORNEYS FOR THE STATE

## CERTIFICATE OF COMPLIANCE

The undersigned does hereby certify that the foregoing document contains 11,367 words.


/s/ Lily Stroud
_____
LILY STROUD

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on March 11, 2015, a copy of the foregoing response to relator's Emergency Petition for Writ of Mandamus was emailed, through an electronic-filing service provider, to relator's attorneys: Joe A. Spencer, Jr., joe@joespencerlaw.com; and Joshua C. Spencer, joshua@joespencerlaw.com.

The undersigned also does hereby certify that on March 11, 2015, a copy of the foregoing response to relator's Emergency Petition for Writ of Mandamus was hand-delivered to Respondent, Honorable Luis Aguilar, Judge, 243rd District Court, 500 E. San Antonio Ave., 9th Floor, El Paso, Texas 79901.

/s/ Lily Stroud
LILY STROUD

51

# APPENDIX – TABLE OF CONTENTS

Appendix A.......................... State's Notice to Seek the Death Penalty

Appendix B.............. Reporter's Record of October 2, 2014, pretrial hearing

Appendix C............................. Trial court's October 6, 2014, letter

Appendix D........ Notice of Filing of Documents for Clarification of Record of Article 38.43 Hearing on October 2, 2014

Appendix E............. State's chart of DNA results and hand-delivery receipts

Appendix F............. May 9, 2013, DPS Forensic Biology Laboratory Report

Appendix G.................. August 12, 2013, DPS DNA Laboratory Report

Appendix H.......... April 29, 2014, DPS Supplemental DNA Laboratory Report

Appendix I. .............. June 13, 2014, DPS Supplemental Forensic Biology Laboratory Report

Appendix J. .............. June 17, 2014, DPS Supplemental Forensic Biology Laboratory Report

Appendix K................ July 17, 2014, DPS Supplemental Forensic Biology Laboratory Report

Appendix L........... September 19, 2014, DPS Supplemental Forensic Biology Laboratory Report

# IN THE DISTRICT COURT OF EL PASO COUNTY, TEXAS
## 168TH DISTRICT COURT

THE STATE OF TEXAS

vs.

LUIS SOLIS GONZALEZ

20120D04103

### STATE'S NOTICE TO SEEK THE DEATH PENALTY

Comes now the State of Texas, by and through the undersigned District Attorney, and hereby gives notice to this Honorable Court, and to the Defendant and his counsel in the above-styled cause that, if convicted of the offense of Capital Murder, the State of Texas will seek the death penalty against the Defendant herein.

Respectfully submitted,

**JAIME ESPARZA**
District Attorney
State Bar No. 06666450
500 E. San Antonio, Suite 201
El Paso, TX 79901
Ph. (915) 546-2059
Fax (915) 533-5520

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing STATE'S NOTICE TO SEEK THE DEATH PENALTY in the above-styled cause was delivered to Mr. Joe Spencer, Attorney for the Defendant, on this the [7] day of October, 2012.

**JAIME ESPARZA**
District Attorney

A TRUE COPY, I CERTIFY
NORMA L. FAVELA, District Clerk
By _____ Deputy
3-10-2015

REPORTER'S RECORD.
TRIAL COURT CAUSE NO. 20120D04103
VOLUME 1 OF 1 VOLUMES

| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS | ) | EL PASO COUNTY, TEXAS |
| | ) | |
| LUIS SOLIS GONZALEZ | ) | 243RD JUDICIAL DISTRICT |

************************

PRETRIAL HEARING

************************

On the 2nd day of October 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Luis Aguilar, Judge Presiding, held in El Paso, El Paso County, Texas.

Proceedings reported by Machine Shorthand.

APPEARANCES

DENISE BUTTERWORTH
Assistant District Attorney
SBOT No. 24012368
500 E. San Antonio, Room 201
El Paso, Texas 79901
(915) 546-2059

ATTORNEY FOR THE STATE

JOE AURELIANO SPENCER
SBOT NO. 18921800
JOSHUA SPENCER
SBOT NO. 24067879
1009 Montana Ave.
El Paso, Texas 79902
(915) 532-5562

ATTORNEYS FOR DEFENSE

CHRONOLOGICAL INDEX
VOLUME 1

Thursday, October 2, 2014

| | Page | Vol. |
|---|---|---|
| Case called/announcements of counsel | 3 | 1 |
| Argument by Ms. Butterworth regarding 38.43 | 3 | 1 |

| State's Witnesses | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Nicholas Ronquillo | 29 | 35 | | 1 |

| | Page | Vol. |
|---|---|---|
| Response by Mr. Spencer | 36 | 1 |
| Response by Ms. Butterworth | 40 | 1 |
| Response by Mr. Spencer | 45 | 1 |
| Issue of Speedy Trial | 46 | 1 |
| Response by Mr. Spencer | 47 | 1 |
| Response by Ms. Butterworth | 47 | 1 |
| Court Reporter's Certificate | 53 | 1 |

(Open court; Thursday, October 2, 2014; defendant present.)

THE COURT: The Court calls the lawsuit styled the State of Texas versus Luis Solis-Gonzalez, 20120D04103.

Announcements of counsel.

MS. BUTTERWORTH: Denise Butterworth on behalf of the State, Your Honor. The State is ready.

MR. SPENCER: Good morning, Your Honor. Joe Spencer on behalf of Mr. Gonzalez, and we're ready.

THE COURT: Good morning, sir.

We're here on a pretrial hearing. I sent you-all a letter. The issue that I'd like to address by both counsel this morning is the applicability of 38.43, code of criminal procedure.

Says the State of Texas?

MS. BUTTERWORTH: Your Honor, for purposes of the hearing this morning, if I may on the record just very briefly so that we are on the same page as to exactly what we're attempting to do this morning. My understanding from the Court is that we're going to have a discussion regarding 38.43, which is the new law that the state legislation has passed that has gone into effect on this particular death penalty case.

I believe -- and this is where Mr. Spencer can correct me if I incorrectly summarize his position. But we are here before you today because under 38.43, there are provisions

that would allow the State and the defense to come together to have a discussion or to talk about whether there could be an agreement on which items ultimately to send to DPS for testing -- for DNA testing in this particular case.

Mr. Spencer, on behalf of the defendant, is in the position that he would like each and every piece of evidence that was collected by law enforcement in this particular case to be tested or possibly screened to see if it's possible to be tested for DNA testing, that in this case, there is not an agreement as to specific pieces of evidence to test, that the defense is asking that all evidence that contained biological material be tested or screened for DNA.

And let me just pause right there to get an affirmation that I am correctly summarizing the defendant's position in this particular case right now for this hearing.

Is that correct, Mr. Spencer?

THE COURT: Ms. Butterworth, direct comments to the bench, please.

MS. BUTTERWORTH: I'm sorry. That's my understanding of the defense and why we're here.

The State's position --

THE COURT: Let me interrupt you if you don't mind.

Mr. Spencer, before we progress here, is that an accurate assessment of your position?

MR. SPENCER: I think that's skeletally accurate. It's accurate, Your Honor. It's not completely all-encompassing on my position. But so far, she has not articulated anything that is not accurate.

THE COURT: Thank you.

You may proceed, ma'am.

MS. BUTTERWORTH: In this particular case, Your Honor, when the State reads the statute, I read it to say that if we cannot come to an agreement -- and in this particular case, we have submitted every single piece of evidence that contains biological material. We have submitted that physical evidence to DPS for testing. But it is our position that under this statute, if the State and the defense cannot come to an agreement, that the statute requires us to come before you for the Court to determine which pieces of evidence should be tested for DNA or should be submitted.

Currently, we have submitted everything. What I would like to do this morning is, for the record, to make sure the record is complete depending on where this goes, I would like to submit to the Court the lab tests that have currently been generated by DPS. And they have been turned over to the defense. And we've got -- as of today's date, we have a lab report from DPS from May 9th, 2013, August 12th of 2013, April 29th of 2014, June 13th of 2014, June 17th of 2014, and July 17th of 2014, and November 19th of 2014.

I'd like to submit to the Court these DPS reports, the corresponding documentation that the defendant has received copies of all of these lab reports. And then I have also created a spreadsheet for the Court -- and I'll tender a copy to the defense -- of so far the DNA results that have been yielded from the testing that's been done as of today's date. If I may approach?

THE COURT: Yes, ma'am.

Ma'am, did you say "November 19th of 2014"?

MR. SPENCER: That's what she said, Your Honor.

MS. BUTTERWORTH: I meant September. If -- I meant September of 2014 for the last lab report.

THE COURT: All right. Okay.

Mr. Spencer, do you have a copy of these exhibits?

MR. SPENCER: I have a copy of what she just now handed me, Your Honor. I do have -- if I understand the Court's question, I do have lab reports from June 13th of 2014, June 17th of 2013, July 7th of 2014, September 19th of 2014. I don't believe I have an April 29th of 2014, an August 12th of 2013, or May of 2013, at least that I am aware of. Those three, I don't believe I have.

MS. BUTTERWORTH: And to cover our bases, I have hand delivery slips that have been signed by the defense for all of these lab reports.

THE COURT: Let me do this real quick.

Mr. Spencer, we're going to make a complete copy of what's been tendered to the Court, and you can review it. That will be your copy.

MR. SPENCER: Thank you, Your Honor.

THE COURT: All right.

MS. BUTTERWORTH: What I've also gone through and done for purposes of this hearing is, every single piece of evidence that was collected due to the investigation of this particular case that has been submitted to DPS was photographed. And so for the Court's perusal, I'm assuming in the next coming days when the Court is making the decision, I've got all of the photographs of every single piece of evidence that was collected and has also been submitted to DPS for testing. So when we start referring to some of these pieces of evidence when we start to get into a little bit of the facts of the case, all of the photographs are here. There's a photograph of each piece of evidence.

And for the record, for example, JEO2 -- JEO2, when collected by law enforcement, it's marked and given that identification number. JEO2 is, in this particular case, a kitchen knife that's found on the kitchen counter. So at any given time when the Court's looking at any of these lab reports or looking at the results or the DNA results yielded, there is a photograph of JEO2 of what that item is and where it's found in

the house. And I've got all the photographs of each piece of evidence that was collected.

And for the Court to look at also, I've got the crime scene video that law enforcement does at their crime scenes where they basically take a camcorder or a video recorder and they record an entire crime scene. In this particular case, it's the house on Bengal Street. And so for the Court to understand basically what the layout is of this particular case of the crime scene as far as what this house looked like or what was going on, I've also got the videotape of that.

And so I've got all the photos and then a complete copy of the videotape for the Court to look at the house. And that's all available for the Court to look at when determining if there is an argument as to items that are absolutely crucial or that the defense is asking to be tested. We will have a photograph corresponding to what that item is, where it's found within the house.

If I may briefly direct the Court to the spreadsheet that I've tendered to the defense. Does the Court have the spreadsheet?

THE COURT: No, I don't.

MS. BUTTERWORTH: I think we're making a copy of it right now.

While we're waiting for the spreadsheet and for purposes of the record, Judge, I'd like to give a brief summary

of what is happening at this particular house on Bengal Street, the crime scene that law enforcement is investigating.

They are -- on May 31st of 2012, El Paso Police Department is dispatched out to 1594 Bengal, number G [sic]. That's located in El Paso County in the State of Texas. When officers arrive and ultimately when the scene is sealed and enclosed, they find three victims inside of that house found dead.

The first victim is Eric Santiago -- DeSantiago, and he is found dead inside of the kitchen with his face wrapped with duct tape. There are burns to his chest that are believed to have been caused by, based just on the scene, oil that was heated up in the kitchen. He's got those burns to his chest, and he has numerous stab wounds and blunt force injuries to his head.

The second victim is Marysol Saldivar. She is found in the living room with blunt force trauma injuries to her head. And the third victim is C████████ H███ who is a 13-year-old little girl who is found in her upstairs bedroom -- it's a pink bedroom -- in her bed covered up, tucked into her bed wearing only a T-shirt and underwear. And there is a slight ligature mark to her neck upon closer examination.

The cause of death in these particular cases, after an autopsy was conducted, was that C████████ H██, the 13-year-old little girl found in her bed, died from the ligature

strangulation around her neck. And then Marysol Saldivar, who was found in the living room, her cause of death was both stab wounds and blunt force trauma to the head, which is also the same cause of death for the male, DeSantiago, found in the kitchen.

And as a brief continuous summary, the defendant did turn himself in to law enforcement. He met them. He had originally gone to Mexico where he took his four-year-old little boy who was present for all of this. He was at the scene. He had been with his mother, Marysol Saldivar, when she got home. The defendant had taken that little boy, his biological son, with him after he left the Bengal house, had gone to Mexico, went over to his parents' house, who live in Mexico, delivered the four-year-old little boy, and then left. He ultimately told his parents what he did.

The dad was cooperative with law enforcement and met law enforcement here in El Paso, turned over the little boy, explained to law enforcement that his son did tell him that he had done this. And then the defendant met law enforcement at the border and turned himself in.

Once he was in the United States, he was taken and interviewed at the CAP offices on Raynor, where he gives a statement where he admits that on that day, he rode his bicycle over to the victim's house, broke into the house at about ten in the morning and waited for them to get home later that day. I

believe he said that the first person to get into the house was Mr. DeSantiago, who arrived at about 4:30. Then he says C███████ H██ arrived second, and Marysol Saldivar arrived third.

He -- in his statement, he admits to killing Mr. DeSantiago and Ms. Saldivar, but says he doesn't remember or has memory issues regarding the incident and doesn't remember anything regarding C███████ H███ - I think he ultimately denies killing her, but he does confess to tying her up during this process upstairs and having her be tied up in this little boy L██ S███████ room, the four-year-old.

Ultimately, as far as evidence is concerned in this case, the house itself containing all of the evidence -- that's part of the evidence in this particular case. The four year old, when he's turned over to the police by his grandfather, his clothes are taken also because there appears to be bloodstains on some of his clothes.

And then the defendant -- and I forgot to mention this. When he left the house on Bengal Street, he took Marysol Saldivar's truck. That's how he was able to go over into Mexico. So that truck was recovered. And then so whatever evidence that is contained or found in that truck is also pieces of evidence that were collected from the El Paso Police Department. I believe there's some blood swabs and pieces of blood found in the truck as well. And then there was blood

found on the child's clothing.

So that's a brief -- for purposes of this record, those would be the three areas that evidence is being taken from regarding this investigation; the house on Bengal, the little boy's clothes when he's turned over, the truck that's found in Mexico and taken -- brought back to the United States. And then also when the defendant turned himself in, the El Paso Police Department collected his clothing, which he was wearing. And that -- so those are pieces of evidence as well. And then anything evidentiary-wise that is collected from all three of the victims during their autopsies, their clothes, fingernail scrapings, those type of things that were collected during the autopsy are also pieces of evidence that have all now, at this point while we're looking at 38.43, have been turned over to DPS for DNA testing.

With that summary, I'd like to go through so far the DNA results that have been yielded from some of these items that have been tested by DPS. And so these are the results that we have as of today's date, which is October 2nd of 2014. I've created this spreadsheet to give the Court some information so that the Court can look through the lab results. But I've taken what the DNA results are from the lab reports and I've put them in the spreadsheet.

I can tell the Court that when we were looking -- initially at looking at what to turn over to DPS for DNA

testing, the idea was to make sure that any other possible defendant could be excluded. And that obviously -- the other part of at least -- and that would be a very -- I would say that an important goal of the DPS testing was to eliminate any other suspects or defendants in this particular case.

And then the other reasons for the DNA testing was to strengthen the State's case to make sure that we would have, hopefully, ideally, the defendant's blood or DNA inside of the Bengal house. And I forgot to mention that when the defendant turned himself in and his clothes were collected by CAP, there were also photographs, and I've got them included for the Court to look at. There were photographs taken of his hands where the defendant has a couple of, for lack of a better medical term, cuts on some of his hands. And in his statement to the police department, he explained that at some point during all of this, he had gotten cut by the knife that was -- that he used or that was involved in at least the victim of DeSantiago and Ms. Saldivar. And so the photographs of when he turned himself in show that he's got some of these wounds or these cuts on his fingers.

One of the goals of the DNA testing, at least from the State's position, was to try to put the DNA of the defendant into this crime scene and then also have the victims' DNA be found on the defendant himself, from the clothes -- and when the Court looks at the photos, you can see that the jeans

he's wearing when he turned himself in are very visibly covered in blood.

So I would like to go through what the DNA has yielded so far -- the testing has yielded so far on some of these various items that have been submitted. In my spreadsheet, I have given the item number, which will have photographs to correspond to, and then what the DNA results yielded.

JEO2, Your Honor, is a kitchen knife that was found on the kitchen counter at the home on Bengal Street. And there was a swab taken from both the handle and the blade that come back positive for blood. And then when the DNA testing is conducted, the DNA matches -- on JEO2 from the handle, it's a combination or a mixture of DeSantiago and the defendant. On JEO2, the blade, the DNA results yielded a match to DeSantiago. And then it read that it was a combination. And that second part of that mixture, the data was low level data, so no comparison could be made.

JE69 is a knife that is found in the upstairs restroom. You'll see a photograph of it that it's found in the drawer in the upstairs restroom with visible blood on it. JE69, when there was a swab taken from the blade, the DNA test results yielded that it belongs to DeSantiago and the defendant. A swab from the handle of JE69, the same knife, yielded DNA results from DeSantiago and the defendant.

JEO4 is a third knife that's found in this crime scene on Bengal Street. It is a broken knife. The handle of the knife was found on the kitchen floor, and the blade of that knife is found in the kitchen sink. So JEO4 is the handle that was found on the kitchen floor that yielded a result of DeSantiago and the defendant.

JE38, the blade of the knife found in the kitchen sink, was DeSantiago and the defendant.

There were a pair of blue jeans, girl blue jeans that were found in C███████ room, JE72, that had apparent blood on them, and that blood comes back to the defendant.

JE68 is a shoelace that is found in the same drawer that the bloody kitchen knife was found in in the upstairs restroom. It's a pair of black shoelaces. The defendant, in his statement, says that he tied up C██████ H███ using these shoelaces. When they are tested, there is a DNA profile mixture positive for blood. But due to the potential number of contributors, no interpretations were made.

Item number 5208670 -- and that's how it was called. It wasn't given the initialling and a number. That's a tennis shoe that is taken from the defendant when he turned himself in and was at CAP. There was apparent blood on his tennis shoe that he was wearing that they took from him from CAP. And the DNA results on that yielded DeSantiago and Saldivar. So we have two of the three victims' blood coming

back on the defendant's shoe that he was wearing when he turned himself in and was taken into custody.

BM03 is the black T-shirt from the defendant also taken when he was in custody. That DNA comes back to the defendant.

MM01 is a Mickey Mouse baseball cap that was collected from the four-year-old little boy, L██ A██ S██████, when his grandfather turned him over to police. There was apparent blood on that Mickey Mouse baseball cap, and that blood was tested, tested positive for blood. And that blood matches his mother, Marysol Saldivar.

There was a bloody piece of tissue found inside of the Nissan Titan, which is the truck that belonged to Ms. Saldivar that the defendant drove away from Bengal Street to go to Mexico. That's JE113. That was found inside of the truck. And that blood comes back to -- or that DNA comes back to DeSantiago.

There were again these blue jeans that I'm referencing that the defendant had on him when he's interviewed or taken into custody at CAP. It's item BM01. That comes back -- that blood from the defendant's jeans comes back to a mixture of DeSantiago and Ms. Saldivar.

JE17 is a piece of toilet paper. And when the Court looks at these photographs that I'm producing, there are various pieces of tissue. Some of them are just tissue, and

some of them are what law enforcement is describing as like a makeshift finger cast from -- we are deducing that when the defendant cut his finger -- and it's corresponding to the cut on his finger in this photograph when he is taken into custody. And he said it's bleeding a lot. Around the house, there are these makeshift finger casts that keep falling off. So I guess he keeps putting new ones on. So some of those are tested. And then others aren't so obvious as finger casts, but they're just pieces of tissue with blood on them around the house at Bengal Street.

JE17, if you'll look at the photograph, is a piece of toilet paper with apparent blood on it that is found on top of the victim as she is laying there on the living room floor. And for lack of a better word, it's being described found on top of her crotch area. But if you look at the photos, that is where the toilet paper is found. It's right on top of her. And that DNA comes back to the defendant.

JE24 is a piece of duct tape that is found in the upstairs bathtub in the restroom where the bloody knife was found and -- in the drawer along with the shoelaces. That piece of duct tape was examined, and we know just from the scene itself that Mr. DeSantiago was found duct taped in the kitchen. And upon closer examination of C████████ H█████ the 13 year old, you can see remanence of duct tape on her face on her check if you look at the photographs. And you can see duct tape on

her -- I believe it's her ankles and her hands, a little bit of remanence of how it was taken off, but it left that duct tape glue.

JE24, there's a piece of duct tape that's found in the upstairs bathtub that comes back to DeSantiago and Ms. Saldivar.

JE20, there's another piece of duct tape with toilet paper found in a hamper. Stain 1 of that duct tape comes back to the defendant and Marysol Saldivar. Stain 2 of that duct tape comes back to a mixture of C███████ H███, Mr. DeSantiago, the defendant, and Ms. Saldivar. So all four of them are on as a mixture on that stain 2 of that duct tape. And then stain 3 of the duct tape of JE20, item JE20, there was no DNA profiles obtained.

There was also some duct tape found, JE30. That duct tape is found in the little boy L██ A█████ room. The DNA results of that come back to DeSantiago and the defendant. JE28 is another piece of duct tape that's found in a child's bag, a kid's bag, also inside of L██ A█████ room, the little boy. And the DNA results on that one come back to the defendant, Mr. DeSantiago, Ms. Saldivar, Ms. H███ the 13-year-old little girl, and the four-year-old little boy, L██ S█████ So we have five people in that mixture of that piece of duct tape found in the little boy's room.

JE24 is a makeshift finger cast that is found

next to a vacuum outside of the upstairs restroom. The DNA results yielded on that come back to the defendant and Mr. DeSantiago.

JE66 is a finger splint, another one of these makeshift finger cast splints that is found next to the bed of C███████ room -- C███████ H████ bed in her room. And that comes back to the defendant.

There is a tennis shoe that has no shoelaces in it, a black Jordan tennis shoe, JE70, that is found in L███ A████ S███████ room, the little boy's room, with an apparent bloodstain on the tennis shoe that's missing the shoelaces, and that blood comes back to DeSantiago.

There is JE22. It's a white T-shirt that is found in the upstairs restroom. And the DNA results on that come back to Mr. -- with apparent blood, and they come back to blood matching Mr. DeSantiago. The collar of that same shirt was tested, and that came back to -- hang on just a second on this one because I think that came back to a mixture. Let me look.

THE COURT: Ms. Butterworth, is the DPS lab representative here?

MS. BUTTERWORTH: Yes, Your Honor.

THE COURT: If he would assist you, he can sit at counsel table with you.

MS. BUTTERWORTH: Okay. I'm going to come back to

JE22 because I had my secretary type up from my notes for this chart, and I think that the chart is -- let me just -- I can probably -- I'll come back to that one, Judge. So let me hold off on the record.

THE COURT: Ms. Butterworth --

MS. BUTTERWORTH: Okay. So on JE22, I'm going to need to amend my chart. JE22 is the collar of the T-shirt of that white shirt that's found on the restroom floor. And it comes back as a mixture. My chart says "DeSantiago" but should read "the defendant." If we can -- and I can submit a new chart.

THE COURT: Let me make sure I'm with you. JE22?

MS. BUTTERWORTH: Correct. There were different swabs taken from that piece of clothing. It's a white T-shirt. One of the stains is tested, an apparent bloodstain, and it comes back to DeSantiago.

THE COURT: Okay.

MS. BUTTERWORTH: The collar of that shirt is tested, which is traditionally done to try to determine the wearer of the shirt. So on JE22, when the collar of that shirt is tested, it comes back consistent to the defendant. It's a mixture, and the defendant is identified as one of the contributors.

THE COURT: "DeSantiago" is incorrect on the collar of the T-shirt?

MS. BUTTERWORTH: That is correct. It should read "defendant."

MR. SPENCER: Your Honor, from which report? May I inquire as to on which report --

THE COURT: That's the last item on the --

MR. SPENCER: I see that on this spreadsheet. I'm just wondering -- she's referring to the DPS lab report. I'm wondering what date.

MS. BUTTERWORTH: April 29th of 2014.

THE COURT: Thank you.

MS. BUTTERWORTH: There were also some white socks that were inside or along with that T-shirt or shirt that was collected under JE22. Those white socks are tested, and they yield a DNA result coming back to Mr. DeSantiago.

JEA3 is a swab that was taken from a milk gallon -- a gallon of milk that was found in the little boy's room, L██ A█████ room. If you look at the photographs, there an apparent bloodstain on the gallon of milk. And that yielded -- it says, "No DNA profiles obtained." It tested positive for blood, but no DNA profiles obtained.

JE99 is the duct tape removed from Mr. DeSantiago's head, and that's coming back belonging to Mr. DeSantiago. JE99, there was also a rag that was in the duct tape that was removed from his head. That is yielding a DNA result matching Mr. DeSantiago.

The fingernail clippings from the autopsy were taken, JE94 and JE95. The fingernail clippings from Mr. DeSantiago during the autopsy, when they are examined, they are both coming back matching Mr. DeSantiago.

JE78 is the right fingernail clippings of C██████ H██ that were taken during her autopsy. The DNA yielded from her right fingernail clipping on JE78 is yielding a mixture belonging to the defendant and Ms. H██.

The left shoe taken from the defendant from when he was at CAP, item number 5208670, is yielding a result belonging to Mr. DeSantiago.

BMO3 is the black T-shirt from the defendant. Also, there's a blood stain matching Ms. Saldivar. Fingernail clippings were taken of Marysol Saldivar, JE57, right and left fingernail clippings, and they are both matching Ms. Saldivar.

And then BMO1, the stained jeans that were taken from the defendant while he was at CAP, one of the stains is matching coming back to Mr. DeSantiago.

Some of these items, there were multiple stains and multiple swabs taken from these various pieces of evidence. And so those are all individual swabs or stains that are in the process of being tested, and we're waiting for DNA results.

At this point, Mr. Spencer and I have asked -- Nicholas Ronquillo is here from DPS. And very briefly, I have inquired as to where they are in the process of testing, and he

has the number.

Do you know how many items were submitted to you in the lab?

MR. RONQUILLO: So far --

THE COURT: Ms. Butterworth, do you want him from the stand?

MS. BUTTERWORTH: No, I'll just proffer, if it's okay.

THE COURT: That's fine.

MS. BUTTERWORTH: There were a total of 206 items trying to comply with this new article, article 38.43, because there was no initial agreement made by the State and the defense. 206 items have been submitted to DPS for this type of testing. Mr. Ronquillo has represented to myself and Mr. Spencer this morning that they are about halfway done at this point and that he believes that they would be able to be finished with all of the DNA testing and have all of those results by June of 2015.

It is the State's contention, based on the summaries of the lab reports given and the DNA results that have been yielded so far -- and that is why I've got photographs of every single piece of evidence that has been turned over from the various sources that I've explained or outlined earlier in the argument, plus a copy of the video crime scene of the entire house. There has been nothing coming back that has yielding

anything other than what we believe to -- that the evidence is showing so far, that the defendant was there in this house acting alone and committing this particular capital murder.

We've got the victims' DNA coming back on him, on his clothes that he's wearing, his shirts that he's wearing. We have his DNA inside of the house coming back on various items to include some of the knives and the tissue that's being found with the apparent blood on them.

It's the State's position at this point that as we stand here today that the DNA has flushed out what is going on in this particular case and that the DNA results have yielded -- that the people that we know are involved, there's been nothing yet that has come back at any of the relevant blood from the knives or from the crime scene coming back to an unknown, that all of the DNA so far in what has come back is yielding who we know is involved in this case, from the defendant to Ms. Saldivar to Mr. DeSantiago to C█████████ H█ and to the four-year-old boy that was involved, L█ A█.

It is the State's position that 38.43 does not read unequivocally that mandatorily in a death penalty case every single piece of evidence that contains biological material be tested. That is the State's position, and I believe that's partially why we're at this hearing today. We do not contend or feel that when we read the statute that that's what it's saying. We believe the statute was designed -- and I will add my two

cents here -- that the part where the statute says for the state and the defense to come together to make an agreement as to what evidence should be tested I believe was unrealistic on the part of legislation because there is no doubt that Mr. Spencer is going to fiercely defend a defendant in a death penalty case. And he is not going to -- and I don't believe any criminal defense attorney in the State of Texas is going to come to an agreement as to what should be tested and that we just work around this or work it out between the state and the defendant.

The defense -- the defendant is looking at the death penalty in this case. And I don't believe that Mr. Spencer would be alone. I think almost all of the criminal defense bar in the State of Texas who are looking at this statute would never agree with the State of Texas as to what pieces of evidence should be tested. And there was no doubt in my mind that when we began this process, that Mr. Spencer's answer would be, I want every single piece of evidence tested.

Because what it in fact ends up doing is partially, whether it's the motivation or not, the reality is that this ends up significantly delaying the trial. We are in a position now, since we had to turn over, based on this new legislation, 206 pieces of evidence that were collected from the various different sources of this case to be tested by DPS. When the statute was written, there was nothing -- there was nothing done as far as the position of DPS. DPS now has 206

pieces of evidence to test along with their other workload and schedule.

There was nothing taken -- there was no provision that takes into account the personnel or the monetary expenses or the overload that would occur to these various Texas DPS labs that are also just attempting, along with the State, to comply with this statute.

I believe that this statute was designed for the Court to make a determination, based on the facts presented to it, which items should be tested for DNA. And so I have attempted to give the Court an idea of the DNA that has come back so far. I've attempted to give the Court an idea of the evidence that was collected in this particular case. I've done so by providing all of the lab reports, my spreadsheet. And I am tendering to the Court photographs of every single piece of evidence that was collected in this particular case and a videotape of the house so the Court can look at the house in its entirety.

We believe at this point that any significant item that should be tested for DNA has been tested so far. We would argue against the position that 38.43 requires a mandatory no discussion, no-thought process look at what is relevant and what is not relevant to be tested in a death penalty case. We believe that the pieces of evidence in this particular case that are relevant to be tested have been tested based on the DNA

results that have been yielded so far. We believe that we have sufficiently complied with 38.43, and we're asking for the Court to make a ruling basically that not every single piece of evidence be tested for DNA.

THE COURT: Ms. Butterworth, let me ask you, how was it determined what to submit to the lab? I guess what I'm looking for is a -- all -- one from each room or a blood sample from each room? A splattering? Any -- the logic behind that.

MS. BUTTERWORTH: The logic -- so far, everything has been turned over to DPS. But the logic is, we're in a position that we're looking at what was collected by law enforcement. And I'm not sure if I'm answering the Court's question correctly. But the law states that it's evidence containing biological material.

The argument could be made -- and I think this is also something very important for the legislation to keep in mind. The law says it's any piece of evidence that could possibly contain biological material. Well, in this particular case, when the Court looks at the photos and whoever ends up reviewing this decision if we get there, looks at the photos, you can see that a lot of these items have very obvious blood stains. Obviously, we're not scientists. But using our reason and common sense and understanding of what occurs in that house, there's a lot of obvious visible blood stains.

But then you start looking at, for example, a

cell phone that is found on top of the kitchen counter that has no bloodstains. Well, there is an argument that could be made that it could still contain biological evidence from epithelial cells. We know enough to know that any time somebody touches a piece of evidence or a piece of anything, the argument could be made that they've left their DNA by means of leaving their fingerprints or from the fingerprints, epithelial cells, like something from their skin.

So when I sat there and looked at this in its entirety trying to understand what we needed to do and knowing that I would need to be prepared for an argument from the defense, we submitted everything that could possibly be argued that has biological evidence. So that cell phone is found on the kitchen counter. It doesn't have obvious bloodstains. We went ahead -- and I'm dealing with DPS, and they're asking for guidance, but there's no blood on this. And I've told them, "But it could theoretically contain biological evidence because there could be epithelial cells left on it."

THE COURT: Ms. Butterworth, is Mr. Ronquillo here today?

MS. BUTTERWORTH: He is, Your Honor.

THE COURT: I would like for him to explain on the record the July 5th, 2014 letter that he addressed. What I'm looking for in particular is the time frames. In the letter, he refers to projections as to a completion date. I

would like the record to reflect Mr. Ronquillo's position.

MS. BUTTERWORTH: For clarification for the record, it's a June 5th letter. I believe the Court said July, but it's dated on my copy June 5th. And I would like to tender a copy of that letter into this hearing so whoever reviews this can understand where DPS falls in this particular issue, what we're trying to deal with, 38.43.

THE COURT: I want a more thorough explanation of constraints, issues, projections, etc.

MS. BUTTERWORTH: Would the Court prefer that he take the witness stand?

THE COURT: Yes.

Sir, would you please raise your right hand?

(Witness sworn.)

THE COURT: Thank you.

Ms. Butterworth, and again, you understand what I'm looking for.

MS. BUTTERWORTH: I know.

NICHOLAS RONQUILLO,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BUTTERWORTH:

Q. Mr. Ronquillo, at this point, if you could state your full name for the record.

A. My name is Nicholas Ronquillo.

Andrea Quezada, CSR
243rd District Court

Q.   If you could briefly describe your position or your title within the Texas Department of Public Safety.

A.   I am the DNA section supervisor and technical leader for the Texas Department of Public Safety crime lab here in El Paso.

Q.   If you could explain to us briefly your position with DPS regarding this particular case, how it came to you, what problems were presented.   Specifically I'd like to talk to -- maybe we could start with -- and for the record, how many pieces of evidence were initially submitted on this particular case? Do you remember?

A.   There were just a little over 30 initial items for DNA analysis.

Q.   Okay.  So before the new law went into effect, the State of Texas submitted to the Texas Department of Public Safety 30 items -- various items that -- in an attempt to yield DNA relevant -- pertinent DNA to the prosecution or the defense in this case, 30 items were submitted.  The law changed, and then we ended up submitting a total, including I guess the first 30, a total of 206 items in this particular case; is that correct?

A.   There were an additional 156 items initially listed on the submission form.  However, that has grown to 206 with the initial submission simply because, for example, a backpack was listed.  However, there were items within that backpack, and

that's how that number has grown.

Q. Okay. And just for clarification for whoever reviews this, is the backpack that you're referring to a little boy's backpack that was found in the white Nissan truck?

A. No.

Q. A different backpack?

A. A different backpack that was found I believe in the yard of the crime scene on Bengal Street.

Q. Okay. On the outside. And if we look at the photographs, there's a backpack and a bicycle. The entire bicycle -- if you look at the backyard, that's what's found in the backyard of the Bengal Street residence. Is that what we're referring to?

A. We are referring to the backyard of the Bengal Street residence.

Q. So it's grown because an entire backpack was submitted, and then you had to break down the components or the different various things that were found inside?

A. That's correct.

Q. All right. Can you tell us the problems that DPS is having in attempting to comply with 38.43 as it stands right now, which is to test every single piece of evidence that was submitted to you from the El Paso Police Department?

A. So some of the challenges that the Texas Department of Public Safety throughout the State as a whole, the challenge

mainly is just the volume of evidence and to logistically analyze that evidence within a reasonable amount of time. Currently, our policy for a homicide case that does not fall under article 38.43 is that we will only accept ten items of evidence plus the known reference samples. So this is also a policy in place just simply so we can limit the amount of items that are being submitted and so we can reasonably get these items analyzed in a reasonable amount of time.

So as you can imagine, 206 items are well above those ten items that are currently in place in our policy. So there's issues with personnel. We -- I have two individuals, qualified analysts, working this case on a regular basis. There's also a cost that is incurred with the Texas Department of Public Safety because we are a non-charging agency, so there's no fee for service. And the State of Texas takes on that cost, and the DNA analysis is very expensive.

There's also the challenge in analyzing these kinds of evidence because -- Ms. Butterworth did touch on this before. There are some items that may have biological material. But as per policy, the Texas Department of Public Safety does not do touch DNA simply because usually there's not enough DNA there to analyze using our current processes. So these are usually given to another lab to do, a fee-for-service lab. So as a whole, it is a big challenge.

Q. Just for clarification, when you say that generally

your policy is to not do any kind of DNA testing for touch DNA, that would be DNA attempting to -- or testing that is attempting to yield DNA from epithelial cells. Is that a gross way of simplifying?

A. I think that's an oversimplification. Epithelial cells can be taken, and we do do DNA analysis from DNA that's with epithelial cells. But for example, if I touch this desk, we won't do that type of DNA analysis.

Q. Okay. But in this particular case, I've asked you to do that. I've asked you to swipe or take a swab from almost every piece of evidence in this case because I don't want to be in the position -- well, you won't know this, but I don't want to be in the position that something wasn't tested or given to DPS and somehow I'm in the middle of trial on a death penalty case and I'm somehow not in compliance with the new statute. So correct me if I'm wrong. I've given you everything because the argument could be made that almost anything would yield biological evidence. Correct?

A. Yes, that's correct. And we're doing our best to use logic and reasoning and our training and our skills to determine if we need to collect certain swabs for touch DNA.

Q. Okay.

THE COURT: Mr. Ronquillo, realistically speaking, how long would it take to analyze 206 pieces of evidence in this case?

THE WITNESS: The way I came out with a projection of June '15 is that each analyst will work 30 items for DNA analysis in one month, and so that will take you a little bit longer than 7 months.

THE COURT: Mr. Ronquillo?

THE WITNESS: Yes?

THE COURT: An independent lab, how long would they take after you have completed your work? How long -- do you have any way of knowing?

THE WITNESS: No, I don't have any way of knowing that.

THE COURT: Generally, does a private lab go quicker or slower than you?

THE WITNESS: They definitely go quicker just simply because they are a fee-for-service lab. So the more samples that they run, the more income that they make. So for us, in order for me to have personnel specifically dedicated to this case like an independent lab will is just not feasible.

THE COURT: Would you be able to give me a rough estimate of what a DNA analysis for submitted evidence would cost generally?

THE WITNESS: Including their salary and everything to go on with that, I really can't comment on that. I -- even as a supervisor, I do not establish salaries or do cost analysis.

THE COURT: Do you know what a private lab will charge per submitted item?

THE WITNESS: I believe it can range from three to $6,000 per sample.

THE COURT: Oh. All right. Thank you.

MS. BUTTERWORTH: I have no further questions of Mr. Ronquillo.

THE COURT: Mr. Spencer?

MR. SPENCER: Just very briefly, Your Honor. If I may cross-examine?

CROSS-EXAMINATION

BY MR. SPENCER:

Q. Good morning, Mr. Ronquillo. As you know, I'm Joe Spencer. I represent Mr. Solis. I'm going to ask a couple of questions. As I understand what you told this Honorable Court is that 38.43 has imposed a huge challenge on all DPS labs throughout the state; is that correct?

A. That is correct.

Q. And as I understand, your summary of it is it has to do with the volume of evidence and the cost; is that correct?

A. Yes.

Q. And that's really the challenge that's been in place that the legislature has burdened your specific DPS lab or labs like yours in the State of Texas. Correct?

A. That's correct.

MR. SPENCER: I have no other questions, Your Honor.

THE COURT: All right.

Mr. Ronquillo, you can take a seat at counsel table.

You may proceed, ma'am.

MS. BUTTERWORTH: I'm finished as far as what I'm presenting to the Court. I would like to just make I guess a final argument for purposes of the record.

THE COURT: Mr. Spencer?

MR. SPENCER: Yeah. Thank you, Your Honor.

There was a couple of things that Ms. Butterworth said that I think is important, Your Honor. She said that the evidence that they submitted to DPS, they looked at it to strengthen the State's case, that they wanted to flush out what was going on in this case from their perspective. It seems that cost is a factor. You know, when the State of Texas is seeking the State's sanction, assassination of one of its citizens, Your Honor, cost should not be a factor. Justice should not be for sale in this courthouse or any other courthouse in the State of Texas.

Certainly members of the constabulary are the ones that collected the evidence, and they work hand in hand with the prosecutor's office. Ms. Butterworth, in her summary on the second page of the spreadsheet, talked about the two

items that she submitted, JE94, JE95, the right fingernail clippings of DeSantiago. It is obvious that that was done for the purposes of looking for biological evidence that incriminates the defendant. They're certainly not looking for evidence that is exculpatory. They're certainly not looking for any evidence that is mitigating.

In a death penalty case, as the Court knows, mitigation is a special issue to this jury. We tried a death penalty case this year in which the prosecutors directed -- based on the testimony that was presented at trial -- the crime scene technicians on what evidence to collect and what evidence not to collect. They dictated what evidence was going to be submitted for analysis. As I understand, the initials "JE" indicate the crime scene technician personnel, the person that actually took -- based on prior testimony and prior evidence and prior cases, that would identify the individual that collected it and the number that he assigned to it.

In a case that we tried earlier this year in a death penalty case, we know, for example, that the prosecutors went out to the crime scene. They directed -- based on the crime scene technician's testimony -- what evidence to collect. They later met with the district attorney. He then met with his assistant DAs. They met with the crime scene technician, went back out to the crime scene, and instructed that crime scene technician what other evidence to further collect.

38

None of that evidence was done and then was testified by Ms. Vandenbosch in that case. That was done to strengthen the State's case. None of this evidence that has been collected is for the purposes of mitigation. They might want to argue, Well, we have an obligation under the code to look for exculpatory evidence. But they have never looked for mitigation evidence.

Now, I'm not going to recite Ms. Butterworth's opening statement that tells the Court and lays out the scene and says why all this is important. I'm not going to respond in like fashion because I'm not obligated to give the State my defensive theories.

Certainly, I think the wisdom of the legislature, when they passed 38.43, when the State of Texas is trying to execute one of its citizens, has an absolute right to have all the evidence tested. There is a reference for identification, but it didn't limit it there, Your Honor. And we believe that the legislature -- although Ms. Butterworth indicates legislature was shortsighted in the type of cost analysis that it was going to burden the DPS, that's not an issue for this Court. That's not an issue where justice is sold at this courthouse.

Mr. Solis is entitled to have a complete defense. There are many -- and I would be glad to articulate to the Court on an ex parte fashion the defensive reasons of why we believe

all the evidence is important because the State of Texas is not entitled to know that. We are not obligated to tell them why. But they have told you that they are looking for evidence to strengthen their case. That's what she said. That's the concern that I have. And unless all the evidence is tested, will Mr. Solis have the opportunity to have not only exculpatory evidence there but mitigating evidence, which is a special issue for the fact finder in this type of death penalty case?

So for those reasons, Your Honor, we ask that -- we're on track. We've done -- as I understand by Mr. Ronquillo, half of the evidence has been tested. We have another half to go. We certainly don't feel that justice should be compromised by the cost factor, especially if one of our citizen's life is at stake, certainly a person in this country charged with the death penalty. And we ask that they be allowed to complete the analysis and turn it over in the manner in which the schedule they anticipate they're going to do.

I appreciate that we are getting these piecemealed as DPS is providing the lab report. You know, we're looking at them now, so we don't have to wait until June of 2015, then we're going to start for the first time then. So if the Court would ask the DPS lab as those reports are submitted that they turn them over to us at the same time, that would expedite this process and we can eventually get this case tried, which is something that Mr. Solis wants to do as soon as

possible.

But he doesn't want to compromise his life much less his freedom because of the cost factor or because DPS is overwhelmed or because Ms. Butterworth thinks that the legislature is shortsighted. I don't believe that is a factor. Death is different. Death is different. When the State of Texas is seeking the death penalty, then we're certainly entitled to have -- all of his lawyers are entitled to have -- be properly prepared to have a fair trial, to have effective representation, and so that justice can be served.

THE COURT: Anything else on the applicability of 38.43 from the State?

MS. BUTTERWORTH: No, Your Honor, other than -- I don't believe that 38.43 is telling the State of Texas or these courts or DAs offices or defense attorneys that every single item must be tested. And we're looking for some clarification here for cases down the road and this case as well. I don't believe that this is at all, when it's read word for word, what this statute is saying, that unless there is an agreement by the state or the defense that every single item must be tested. I believe that this statute is intended for the Court to determine.

And just to clarify Mr. Spencer's argument, I did say that part of the testing that we do in any case, not just this case but this case especially, is part of it is to

exculpate a defendant. The State of Texas, specifically myself, I'm not in the business of trying to convict innocent people and get them a death penalty. I believe that most prosecutors would agree that we have every vested interest as well in making sure that we have the right guy. And if evidence can be tested, it should be tested to determine if we do. So it could either strengthen our case or it could exculpate a defendant, and I did say that.

I do believe that the intent behind this statute is absolutely not designed that pieces of evidence containing biological material be tested or sent to DPS to strengthen the State's case. That, I don't think -- and I'm sure Mr. Spencer would agree with me -- that that was not the intention of this statute. It was intended, and there's no doubt based on all the changes that were made, to make sure on death penalty cases that if a person or a defendant receives the death penalty, that the person was in fact guilty and not innocent.

So in this particular case, I think the Court can look at all of the pieces of evidence that were collected. I know a lot of the new law that was passed, especially what's being referred to as the Michael Morton act, all of it had that case in the back of their mind where their -- years ago, although I'm not even sure DNA testing existed back then. But years ago, there was one piece of evidence that turned out to be very dispositive and that allowed him to be freed and released

from prison.

In that particular case, though, I think especially this Court -- this Court is a learned judge who used to practice criminal law. This Court has watched criminal cases go to trial. This Court understands the nature of DNA testing and what can be yielded from it, the arguments that can be made on both the state and the defense side. This particular judge, Your Honor, you were a prosecutor and you were a defense attorney. So you will understand the logic on what pieces of evidence should be tested and what shouldn't, not just for strengthening the State's case, exculpating the defendant, or any kind of mitigation.

That is why I believe that statute was read that it will be now in your Court to determine what should be tested for DNA. And it shouldn't just be what the State says should be tested, although that's honestly never the case. In any other case, even before, if a defense or a defendant wants a piece of item -- a piece of evidence tested for DNA, they have also been able to request that. In any other case, besides 38.43 -- if it had been any other murder or capital murder trial where there is a piece of evidence the defense is asking to be tested for DNA, that can be done. They either can ask the Court to have the State turn over that piece of evidence so that their independent lab can test it, or they can ask the Court to order the State to ask DPS to test that piece of evidence. That's always been an

option that has been in the law and has been part of trial preparation on any case. That has also been something that the defense can ask for always through the Court.

But in this particular case, I just don't think that the intent of 38.43 is that there is a mandatory absolutely every single piece of item be tested. I don't see very many cases where the state and the defense agree on what should be tested. I also think the defense will take the stand that every single item be tested, and so then it falls on the Court.

The way I read the statute, to determine what is relevant for testing, if there is one piece of evidence out there that would be very indicative or just for the multiple reasons why we test for DNA -- and that's why I've given the Court all of the photographs of every single piece of evidence that was tested, a layout, a summary of what this is.

And I would just like to remind the Court and whatever reviewing courts look at this if we get that far, our job is to seek justice. And I understand Mr. Spencer may not represent to the Court that that's what our job is or may think that that's not what we do, but that is what we do. Our job is to seek justice. Or job is to look at the multiple reasons for DNA testing, especially in a death penalty case.

And in this case, I submit to the Court that we have produced and have already tested a plethora of different items from all sorts of different angles throughout the house or

any other argument that could be made and that we are at the point where we should be able to move forward and go to trial on this case based on what has already been produced.

And that is why we're arguing to the Court today. I believe it's not only money, but I believe that there is a delay. There has been a delay created in this particular case based on the interpretation of 38.43. We are now delayed in possibly going to Court. Because what's going to happen possibly is, once we get all of the DNA results back from these 206 pieces of evidence, I suspect and anticipate -- and I think this argument could be made for any capital case down the road and any other court in the State of Texas -- that it will then be the defense asking for the same amount of time to do their DNA testing or to have the same amount of time to retest or reanalyze or get their expert to look at the DNA results. And so now we're talking about -- our DNA will be finished by June of 2015. Where is the Court going to be when the defense turns around at that point and says, Now I need a year, two years, three years, however many years the State had. I now need that time to conduct my DNA testing as well.

These are the issues and the problems that are coming up if 38.43 is interpreted to mean that every single item be tested. These are the delays that go hand in hand if that is how this statute is interpreted. And I do not believe, representing the State of Texas, that that is how the statute

reads. I believe it reads that we each make our argument of what should be tested, what shouldn't be, and that the Court determines what should be tested or what should be sent.

And that is why, at least for my part of this hearing, I have submitted to the Court all of the items that were collected, photographs of the items collected, where they were found in each representative place that they were collected, and what we have been given so far as far as the DNA that's been yielded on the amount of items that have been already been analyzed thus far. We're asking the Court to boldly make a ruling as to how this Court interprets 38.43 in this particular case.

MR. SPENCER: May I respond to the delay issue, Your Honor?

THE COURT: Yes, sir. Before you start, can we continue to argue 38.43? And once we're done arguing the applicability of 38.43, then we'll address the second issue of the speedy trial.

MR. SPENCER: Okay. Thank you, Your Honor. Ms. Butterworth talks about the delay tactic that might be their tactic. The State of Texas knew six months before this statute was enacted that the statute was coming before the legislature and when it was passed. They knew that. And as Ms. Butterworth has told you, every defense lawyer in the State of Texas is going to ask for everything to be done. They knew it was going

to be done. So if it's any delay, it falls on the shoulders of the State of Texas with their lack of foresight. They knew the statute was in the legislature. They knew it had been passed, and they still delayed the process in getting it tested, and they want to put it on the defense.

And it's a little disingenuous of the State of Texas to say that the defense is going to ask, all right -- I guess she's accepting that it might be fair -- that we have the same amount of time that the State had to test it. That's not what the defense would do. The defense would have the ability that would have to be privy to the underlying data that the lab has done, reviewing that data to make sure that the data was done properly, that there was no cross-contamination, without question -- having to retest everything. So it would take us nowhere near but a fraction of the time that the State of Texas had to respond to that, Your Honor.

With respect to the speedy trial issue, Your Honor, do you want me to address that?

THE COURT: Yes, sir.

Anything else on that applicability of 38.43?

MS. BUTTERWORTH: No, Your Honor.

MR. SPENCER: No, Your Honor.

THE COURT: All right. Let's address the speedy trial issues. My concern is that the defendant has been incarcerated going on two and a half years. And that's one of

the issues that I'm attempting to address. That's just an exceptionally long amount of time -- period of time.

MR. SPENCER: It is, Your Honor, especially for a Court that is as expedient as this Court is, so I know it bothers the Court. I'll represent to you on behalf of Mr. Solis, Mr. Solis will waive any speedy trial issue on the record, Your Honor, not going to make an objection to a speedy trial issue. Mr. Solis is more concerned about making sure that he is properly defended and he is prepared because his life is at stake. And that is upmost of what his concern is. So with respect to the speedy trial issue, he will waive any concerns having to do with speedy trial.

THE COURT: Ms. Butterworth?

MS. BUTTERWORTH: My only response to that would be, Judge -- and I know it's not an argument from the defense -- is that in a sense, the State is entitled to a speedy trial as well. We have multiple family -- victims' family that are part of this case that have been part of this journey from the day they get news of what occurred to their loved ones. And now we are in a position where we -- they are delayed as well. The State is delayed. The defendant is delayed. The family is delayed. This Court is delayed waiting to see if we can get some guidance or clarification of 38.43.

I understand that it's probably the upmost importance to look at the defendant first, and he is entitled to

a speedy trial. But the State also has rights as well in the sense that, you know, both sides should ideally be able to go to trial as quickly as possible making sure that all rights are protected in a case like this because everybody is waiting.

I just -- I think that there are unnecessary delays that are created in the interpretation of 38.43 for both sides, for the defendant and the State, if it is interpreted that every single item must be tested for DNA that possibly contains biological material.

THE COURT: In the event that the defendant was to be found incompetent, your opinion as to the validity of his waiver of the speedy trial?

MR. SPENCER: I'm sorry, Your Honor? Would you ask --

THE COURT: In the event that the defendant was found incompetent, what would -- what if any impact would that have on the validity of his waiver of speedy trial?

MR. SPENCER: I don't believe that competency has been an issue with respect to Mr. Solis, Your Honor. In all conversations that I've had with him, his current competency is not an issue. So I believe that, in my opinion after numerous discussions with him, I think he is currently competent. And I think that he can make a valid waiver of a speedy trial based on his competency.

THE COURT: Just a thought that crossed my mind.

All right. Says the State? Anything further from the State?

MS. BUTTERWORTH: No, Your Honor.

THE COURT: The defense?

MR. SPENCER: No, Your Honor.

THE COURT: I will have my decision Monday morning, 0800.

Anything further?

MS. BUTTERWORTH: Nothing, Your Honor. I would like to tender to the Court the photographs and the video.

MR. SPENCER: Your Honor, before she tenders it to the Court, I would like to have an opportunity to examine that, everything she's going to tender. I would like to have an opportunity to cross reference it with what I have. I'm not sure that everything is here that -- what I have. So before that gets turned over to the Court, I would like to make sure that the Court has a complete picture.

THE COURT: All right. That's fine. Then I will retract Monday morning, 0800. I would like three days with that file. I do not know what's in there.

Ms. Butterworth, is that something I would be able to review thoroughly in three days?

MS. BUTTERWORTH: I think, so, Judge. So if -- I'll just break it down for you. What I've done is basically in a file folder, I've delineated the various pieces of evidence,

and I've broken them down in different file folders. What I've done is, in each file folder, I've labeled the piece of evidence that should be represented by the photograph contained in the file folder. And then I've also included a copy of the defense -- excuse me -- of the officer's supplement that collected that piece of evidence.

We're not in front of a jury. I'm proffering that to the Court so that the Court can have an understanding of the description of -- for example, JE09. In the supplement, there will be a description of what JE09 is and where it came from. So obviously Mr. Spencer can look at those supplements.

I would also add on the record for the purposes of this hearing, Mr. Spencer has received a copy of all these supplements. They have been turned over and would have or could have and maybe perhaps even down the road could have submitted to the Court anything else that the defense would like for the Court to review in making this ruling. This is what the State is proffering to help the Court make a ruling, which are the photographs and the explanations of what each particular piece of evidence is that correspond to the supplement.

THE COURT: All right.

Mr. Spencer, review that file. How long do you anticipate being in possession of that file? Is there any way of knowing?

MR. SPENCER: Your Honor, I don't imagine it's

going to take me long to review this file. What's going to take long is to compare it with what I have. Ms. Butterworth is correct. I believe I have a complete set of the file. I don't believe that what Ms. Butterworth is going tender to the Court is going to be what I believe should be all inclusive encompassing of what we believe why we're asking all the DNA evidence to be tested. And I don't know what other notes or writings or what Ms. Butterworth intends to give to the Court. I will examine that.

Once I've had an opportunity to examine that and then compare it with what I have, then -- I don't want to be duplicating anything for the Court. So I will then add a supplement of what I believe is relevant and give Ms. Butterworth an opportunity to what I'm giving the Court as well.

THE COURT: Why don't we do this?

Mr. Spencer, review the file, supplement it with your exhibits, return it to Ms. Butterworth.

Ms. Butterworth, review what's been handed to you, and then just forward it to me. And then just give me some time.

And don't hold me to those three days because, Mr. Spencer, you're going to be adding documents. I'm going to thoroughly review what's submitted to me. So once you submit it to me, I will let you know how much time it will take to review

it.

Anything further?

MR. SPENCER:  Nothing further, Your Honor.

MS. BUTTERWORTH:  No, Your Honor.

THE COURT:  Thank you very much.  You-all are excused.

MR. SPENCER:  Thank you.

(Wherein proceedings concluded.)

53

STATE OF TEXAS                    )

COUNTY OF EL PASO                  )

I, Andrea Quezada, Official Court Reporter in and for the 243rd District Court of El Paso County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is *$212.00* and was paid/will be paid by *District Attorney's Office*.

Witness my official hand, this the 20th day of February 2015.

/s/Andrea Quezada
Andrea Quezada, Texas CSR# 9126
243rd District Court
El Paso, TX  79901 (915) 546-2168
Expires:  December 31, 2015



**LUIS AGUILAR**
**JUDGE**
243ᴿᴰ **DISTRICT COURT**
**EL PASO COUNTY COURTHOUSE**
500 E. San Antonio Rm.901
El Paso, Texas 79901

(915) 546-2168

FILED
NORMA L. FAVELA
DISTRICT CLERK

2014 OCT -6 AM 10: 00

EL PASO COUNTY, TEXAS

BY_____
DEPUTY

October 6, 2014

**_Via Facsimile No. 915/532-7535_**
Mr. Joe A. Spencer
Attorney at Law
1009 Montana Avenue
El Paso, Texas 79901

Re:    *State of Texas v. Luis Solis-Gonzalez,* Cause No. 20120D04103 in the 243rd
       Judicial District Court, El Paso County, Texas

Dear Mr. Spencer:

At the October 2, 2014 pre-trial hearing on the above-styled and numbered lawsuit, the
State of Texas tendered to you on the record, their proffer of exhibits for the Court's
review. That proffer included a list of all exhibits that have been submitted to the
Department of Public Safety laboratory for analysis.

In the event you believe the State has failed to submit a necessary piece of evidence,
please identify that item and your justification for its analysis.

If you would return their proffer, along with any additional exhibits you believe would
assist the Court by October 13, 2014 at 10:00 a.m., I would appreciate it.

If you have any questions, please contact me.

Respectfully submitted,

Hon. Luis Aguilar
Judge, 243rd Judicial District Court

cc:    Ms. Denise Butterworth, via facsimile 915/533-5520

LA/ls

A TRUE COPY, I CERTIFY
NORMA L. FAVELA, District Clerk

By_____
3-10-2015               Deputy



*Equal Opportunity Employer*

# Transmission Log

| Date | Time | Type | Job # | Length | Speed | Station Name/Number | Pgs | Status |
|------|------|------|-------|--------|-------|---------------------|-----|--------|
| 2014-10-05 | 21:23 | SCAN | 22134 | 0:07 | 31200 | 9155327535 | 1 | OK -- V.34 AM31 |



**LUIS AGUILAR**
**JUDGE**
243ᴿᴰ DISTRICT COURT
EL PASO COUNTY COURTHOUSE
500 E. San Antonio-Rm 961.
El Paso, Texas 79901

(915) 546-2363

October 6, 2014

**_Via Facsimile No. 915/532-7535_**
Mr. Joe A. Spencer
Attorney at Law
1009 Montana Avenue
El Paso, Texas 79901

Re:    *State of Texas v. Luis Solis-Gonzalez*, Cause No. 20120D04103 in the 243ʳᵈ
      Judicial District Court, El Paso County, Texas

Dear Mr. Spencer:

At the October 2, 2014 pre-trial hearing on the above-styled and numbered lawsuit, the State of Texas tendered to you on the record, their proffer of exhibits for the Court's review. That proffer included a list of all exhibits that have been submitted to the Department of Public Safety laboratory for analysis.

In the event you believe the State has failed to submit a necessary piece of evidence, please identify that item and your justification for its analysis.

If you would return their proffer, along with any additional exhibits you believe would assist the Court by October 13, 2014 at 10:00 a.m., I would appreciate it.

If you have any questions, please contact me.

Respectfully submitted,

Hon. Luis Aguilar
Judge, 243ʳᵈ Judicial District Court

cc:    Ms. Denise Butterworth, via facsimile 915/533-5520

LA/ls



*Equal Opportunity Employer*

# Transmission Log

243 District Court        Sunday, 2014-10-05   21:25        9155468107

| Date | Time | Type | Job # | Length | Speed | Station Name/Number | Pgs | Status |
|------|------|------|-------|--------|-------|---------------------|-----|--------|
| 2014-10-05 | 21:24 | SCAN | 22135 | 0:30 | 9600 | 95335520 | 1 | OK -- V.29 AH30 |



**LUIS AGUILAR**
**JUDGE**
243ᴿᴰ DISTRICT COURT
EL PASO COUNTY COURTHOUSE
500 E. San Antonio-Rm.501.
El Paso, Texas 79901

(915) 546-2163

October 6, 2014

**_Via Facsimile No. 915/532-7535_**
Mr. Joe A. Spencer
Attorney at Law
1009 Montana Avenue
El Paso, Texas 79901

Re:   *State of Texas v. Luis Solis-Gonzalez*, Cause No. 20120D04103 in the 243rd
      Judicial District Court, El Paso County, Texas

Dear Mr. Spencer:

At the October 2, 2014 pre-trial hearing on the above-styled and numbered lawsuit, the State of Texas tendered to you on the record, their proffer of exhibits for the Court's review. That proffer included a list of all exhibits that have been submitted to the Department of Public Safety laboratory for analysis.

In the event you believe the State has failed to submit a necessary piece of evidence, please identify that item and your justification for its analysis.

If you would return their proffer, along with any additional exhibits you believe would assist the Court by October 13, 2014 at 10:00 a.m., I would appreciate it.

If you have any questions, please contact me.

Respectfully submitted,

Hon. Luis Aguilar
Judge, 243rd Judicial District Court

cc:    Ms. Denise Butterworth, via facsimile 915/533-5520

LA/ls



*Equal Opportunity Employer*

IN THE 243rd DISTRICT COURT
OF EL PASO COUNTY, TEXAS

FILED
NORMA L. FAVELA
DISTRICT CLERK

2015 FEB 27 PM 3: 29

EL PASO COUNTY, TEXAS

BY_____
DEPUTY

THE STATE OF TEXAS      §

vs.      §      No. 20120D04103

LUIS SOLIS GONZALEZ      §

## Filing of Documents for Clarification of Record of Article 38.43 Hearing on Oct. 2, 2014

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW THE STATE OF TEXAS, in the above-entitled and numbered cause, and files the following paperwork that was referred to by the State of Texas, and relied upon by the trial court, in the hearing that took place on October 2, 2014 regarding Article 38.43: chart with DNA results for items tested, 4 hand delivery slips, lab reports dated: 05-09-13, 08-12-13, 04-29-14, 06-13-14, 06-17-14, 07-17-14, 09-19-14, and crime scene video.

RESPECTFULLY SUBMITTED,

DENISE BUTTERWORTH
ASSISTANT DISTRICT ATTORNEY
STATE BAR NO. 24012368
500 E. SAN ANTONIO, SUITE 201
EL PASO, TEXAS 79901
(915) 546-2059

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing motion was delivered to attorney for the Defendant, Mr. Joe Spencer, on 27th day of February, 2015.

DENISE BUTTERWORTH
ASSISTANT DISTRICT ATTORNEY

A TRUE COPY, I CERTIFY
NORMA L. FAVELA, District Clerk
By_____ Deputy
3-10-2015

| Item number | Description | DNA results |
|---|---|---|
| JE-02 | Swab from handle of kitchen knife on kitchen counter | Desantiago/Defendant |
| JE-02 | Swab from blade of kitchen knife on kitchen counter | Desantiago/low level data, no comparison made |
| JE-69 | Swab from blade from knife in upstairs restroom | Desantiago/Defendant |
| JE-69 | Swab from handle from knife in upstairs restroom | Desantiago/Defendant |
| JE-04 | Swab from handle of knife on kitchen floor | Desantiago/Defendant |
| JE-38 | Swab from blade of knife in kitchen sink | Desantiago/Defendant |
| JE-72 | Blue jeans in Cassaundra's room | Defendant |
| JE-68 | Shoe lace from upstairs restroom | DNA profile mixture, positive for blood, due to potential number of contributors, no interpretations made |
| 5208670 | Right Nike shoe from defendant's from CAP | Desantiago/Saldivar |
| BM03 | Black t-shirt from defendant from CAP | Defendant |
| MM01 | Mickey mouse baseball cap from L██ A██ S██████ | Mary Sol Saldivar |
| JE113 | Tissue inside of Nissan Titan | Desantiago |
| BM01 | Blue jeans from defendant from CAP | Desantiago/Saldivar |
| JE17 | Toilet paper from Marysol Saldivar crotch area | Defendant |
| JE24 | Duck tape upstairs bath tub | Desantiago/Saldivar |
| JE20 | Stain 1 duct tape w toilet paper inside and under hamper | Defendant/Saldivar |
| JE20 | Stain 2 duct tape w toilet paper inside and under hamper | Mixture: H██;Desantiago;Defendant;Saldivar |
| JE20 | Stain 3 duct tape w toilet paper inside and under hamper | no DNA profiles obtained |
| JE30 | Duct tape from L██ A██ room | Desantiago/Defendant |
| JE28 | Duct tape from kids bag from L██ A██ room | Defendant; Desantiago; Saldivar; H██ L██ S██████ |
| JE34 | Make shift Finger cast next to vacuum outside upstairs restroom | Defendant/Desantiago |
| JE66 | Finger splint from C████████ room next to bed | Defendant |
| JE70 | Stain on Jordan tennis shoe from L██ A██ S██████ room | Desantiago |
| JE22 | Stain white t-shirt-upstairs restroom floor | Desantiago |
| JE22 | Collar of t-shirt – upstairs restroom floor | Desantiago △ |

4-27-14

| | | | |
|---|---|---|---|
| | JE22 | White socks from upstairs restroom floor | Desantiago |
| | JEA3 | Swabbing from milk gallon in L███ A███ room | No DNA profiles obtained |
| | JE99 | Duct tape Santiago head | Desantiago |
| | JE99 | Rag removed from Santiago head | Desantiago |
| | JE94 | Right finger nail clipping DeSantiago | Desantiago |
| | JE95 | Left finger nail clipping DeSantiago | Desantiago |
| | JE78 | Right finger nail clipping H██ | Defendant/H██ |
| | 5208670 | Left Nike shoe from defendant from CAP | Desantiago |
| | BM03 | Black t-shirt from defendant CAP | Saldivar |
| | JE57 | Right finger nail clipping Saldivar | Saldivar |
| | JE57 | Left finger nail clipping Saldivar | Saldivar |
| | BM01 | Stain from jeans of defendant from CAP | Desantiago |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



P.2

# 📠 HAND DELIVERY SLIP

**DATE:** July 1, 2013

**FROM:** ~~Denise Butterworth~~
Assistant District Attorney
DISTRICT ATTORNEY'S OFFICE
500 E. San Antonio
Suite 201
El Paso, Texas 79901

**TO:** Mr. Joe Spencer

**SUBJECT:** Luis Solis Gonzalez, 20120D04103

**ITEM:** 1 disk containing voluntary statement of Defendant
DPS report dated 05-09-13

**RECEIVED BY:** Isbell Machuca

**DATE:** 7/17/13        **TIME:** 12:51

2013 JUL 17 PH 12: 51
JAIME E. ESPARZA
DISTRICT ATTORNEY



## 📠 HAND DELIVERY SLIP

**DATE:** March 7, 2014

**FROM:** _Denise Butterworth_
Assistant District Attorney
DISTRICT ATTORNEY'S OFFICE
500 E. San Antonio
Suite 201
El Paso, Texas 79901

**TO:** Mr. Joe Spencer

**SUBJECT:** Luis Solis Gonzalez, 20120D04103

**ITEM:** DPS report dated 08-12-13

RECEIVED BY: _Marina Hammond_

DATE: 3/10/14     TIME: 4:02 PM



# 🖐 HAND DELIVERY SLIP

**DATE:** July 15, 2014

**FROM:** ~~Denise Butterworth~~
Assistant District Attorney
DISTRICT ATTORNEY'S OFFICE
500 E. San Antonio
Suite 201
El Paso, Texas 79901

**TO:** Mr. Joe Spencer

**SUBJECT:** Luis Solis Gonzalez, 20120D04103

**ITEM:** DPS lab report dated 04-29-14
DPS lab report dated 06-13-14
DPS lab report dated 06-17-14

**RECEIVED BY:** _____

**DATE:** _07/15/14_          **TIME:** _4:10_



# 🖐 HAND DELIVERY SLIP

**DATE:** September 26, 2014

**FROM:** ~~Denise Butterworth~~
Assistant District Attorney
DISTRICT ATTORNEY'S OFFICE
500 E. San Antonio
Suite 201
El Paso, Texas 79901

**TO:** Mr. Joe Spencer

**SUBJECT:** Luis Solis Gonzalez, 20120D04103

**ITEM:** DPS lab report dated 07-17-14
DPS lab report dated 09-19-14

**RECEIVED BY:** _____

**DATE:** 9/29/14 _____ **TIME:** 3:55 _____





# TEXAS DEPARTMENT OF PUBLIC SAFETY

CRIME LABORATORY
11612 Scott Simpson
El Paso, TX 79936
Voice 915-849-4120  Fax 915-849-4113
ElPasoCrimeLab@dps.texas.gov



STEVEN C. MCCRAW
DIRECTOR
DAVID G. BAKER
CHERYL MacBRIDE
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
CARIN MARCY BARTH
ADA BROWN
ALLAN B. POLUNSKY
RANDY WATSON

## Forensic Biology Laboratory Report

Issue Date:  May 09, 2013

| | |
|---|---|
| Jorge Estrada | Laboratory # ELP-1211-01637 |
| El Paso Police Department | Agency # 12152050 |
| 911 N Raynor | County El Paso |
| El Paso, TX 79903 | Offense Date 05/31/2012 |

**Suspect(s)**      SOLIS-GONZALEZ, Luis (DOB 04/18/77)
**Victim(s)**      SALDIVAR, Marysol (DOB 05/06/78)
             H███, C███████ (DOB ███████)
             DESANTIAGO, Eric (DOB 12/29/69)
**Elimination(s)**    S███████, L██ A███(DOB ██████)

**Requested Analysis:** Screen for Biological Evidence.

**Submission Information:**

   01 - Properly Sealed Large Brown Box on November 12, 2012 by Estrada, Jorge VIA In Person

**Evidence Description, Results of Analysis and Interpretation:**

01 : Properly Sealed Large Brown Box

   **01-01-AA : Kitchen knife with black handle from kitchen counter (agency exhibit JE02)**
      Apparent blood was detected.

   **01-02-AA : Small kitchen knife from upstairs restroom (agency exhibit JE69)**
      Apparent blood was detected.

   **01-03-AA : Black knife handle from kitchen floor (agency exhibit JE04)**
      Apparent blood was detected.

   **01-04-AA : Knife blade from kitchen sink (agency exhibit JE38)**
      Apparent blood was detected.

   **01-05-AA : Pieces of toilet paper from Marysol Saldivar's crotch area (agency exhibit JE17)**
      Apparent blood was detected.

   **01-06-AA : Duct tape from upstairs bath tub (agency exhibit JE24)**
      Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

   **01-07-AA : Three pieces of duct tape from inside and under hamper (agency exhibit JE20)**
      Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

   **01-08-AA : Duct tape cardboard roll from L██ A███ S███████ room (agency exhibit JE30)**
      Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

   **01-09-AA : Duct tape from kids bag with toys from L██ A███ S███████ room (agency exhibit JE28)**
      Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

   **01-10-AA : Finger cast made of duct tape found next to vacuum outside of upstairs restroom (agency exhibit JE34)**



ACCREDITED BY THE AMERICAN SOCIETY OF CRIME LABORATORY DIRECTORS - LAB ACCREDITATION BOARD
COURTESY · SERVICE · PROTECTION

TxDPS 04.05.13

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-11-AA : Finger splint from C█████████ room next to bed (agency exhibit JE68)**
Apparent blood was detected. Trace material was observed on this item. To preserve the integrity of the trace evidence, no further analysis was conducted at this time.

**01-12-AA : Blue jeans from C█████████ room (agency exhibit JE72)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-13-AA : Jordan tennis shoes from L██ A██ S███████ room (agency exhibit JE70)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-14-AA : Shoe laces from upstairs restroom (agency exhibit JE68)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-15-AA : White t-shirt from upstairs restroom floor (agency exhibit JE22)**
Apparent blood was detected. Swabs were taken from the collar area to possibly determine wearer. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-15-AB : Pair of white socks from upstairs restroom floor (agency exhibit JE22)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-16-AA : Swabbings from milk gallon in L██s A██ S██████ room (agency exhibit JEA3)**
Apparent blood was detected.

**01-17-AA-01 : Duct tape from Desantiago's head (agency exhibit JE99)**
Apparent blood was detected. Trace material was observed on this item. To preserve the integrity of the trace evidence, no further analysis was conducted at this time.

**01-17-AB-01 : Rag removed from Desantiago's head (agency exhibit JE99)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-18-AA : Right hand fingernail clippings from Desantiago (agency exhibit JE94)**
Apparent blood was detected.

**01-19-AA : Left hand fingernail clippings from Desantiago (agency exhibit JE95)**
Apparent blood was detected.

**01-20-AA : Right hand fingernail clippings from C█████████ H██ (agency exhibit JE78)**
Apparent blood was detected.

**01-21-AA : Left hand fingernail clippings from C█████████ H██ (agency exhibit JE79)**
Blood was not detected.

**01-22-AA-01 : Right Nike shoe from Luis Solis-Gonzalez (agency exhibit S208670)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-22-AB-01 : Left Nike shoe from Luis Solis-Gonzalez (agency exhibit S208570)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-23-AA : Black t-shirt from Luis Solis-Gonzalez (agency exhibit BM03)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-24-AA : Mickey Mouse baseball cap from L██ A██ S██████ (agency exhibit MM01)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-25-AA-01 : Right hand fingernail clippings from Marysol Saldivar (agency exhibit JE57)**

Apparent blood was detected.

**01-25-AB-01 : Left hand fingernail clippings from Marysol Saldivar (agency exhibit JE57)**
Apparent blood was detected.

**01-26-AA : Pair of car seat straps from Nissan Titan truck (agency exhibit JE106A)**
Blood was not detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-27-AA : Tissue paper from inside of Nissan Titan truck (agency exhibit JE113)**
Apparent blood was detected.

**01-28-AA : Blue jeans from Luis Solis-Gonzalez (agency exhibit BM01)**
Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**01-29-AA : Known blood card from C██████ H██ (agency exhibit JE82)**
Item was collected to be used as a reference.

**01-30-AA : Known blood card from Marysol Saldivar (agency exhibit JE58)**
Item was collected to be used as a reference.

**01-31-AA : Known blood card from Eric Desantiago (agency exhibit JE98)**
Item was collected to be used as a reference.

**01-32-AA : Left buccal swabs from L██ A███ S█████ (agency exhibit MM-A)**
Item was collected to be used as a reference.

**01-33 : Sealed envelope containing right buccal swabs L██s A███ S█████ (agency exhibit MM-B)**
No analysis was performed.

**01-34-AA : Buccal swabs from Luis Solis-Gonzalez (agency exhibit 5210932)**
Item was collected to be used as a reference.

## Investigative Leads:

This is a preliminary report. A separate report will be issued upon completion of DNA analysis on selected items.

## Disposition:

Portions of items 01-01-AA, 01-02-AA, 01-03-AA, 01-04-AA, 01-05-AA, 01-06-AA, 01-07-AA, 01-08-AA, 01-09-AA, 01-10-AA, 01-11-AA, 01-12-AA, 01-13-AA, 01-14-AA, 01-15-AA, 01-15-AB, 01-16-AA, 01-17-AA-01, 01-17-AB-01, 01-18-AA, 01-19-AA, 01-20-AA, 01-22-AA-01, 01-22-AB-01, 01-23-AA, 01-24-AA, 01-25-AA-01, 01-25-AB-01, 01-27-AA, 01-28-AA, 01-29-AA, 01-30-AA, 01-31-AA, 01-32-AA, and 01-34-AA were retained to preserve biological constituents. We are unable to retain the remainging bulk evidence in our vault. Please make arrangements to pick it up at your earliest convenience.

This report has been electronically prepared and approved by:

Nicolas Ronquillo
Forensic Scientist III
Texas DPS El Paso Crime Laboratory



# TEXAS DEPARTMENT OF PUBLIC SAFETY

CRIME LABORATORY
11612 Scott Simpson
El Paso, TX 79938
Voice 915-849-4120 Fax 915-849-4113
ElPasoCrimeLab@dps.texas.gov

STEVEN C. MCCRAW
DIRECTOR
DAVID G. BAKER
CHERYL MacBRIDE
DEPUTY DIRECTORS



COMMISSION
A. CYNTHIA LEON, CHAIR
CARIN MARCY BARTH
ADA BROWN
ALLAN POLUNSKY
RANDY WATSON

## DNA Laboratory Report

Issue Date: August 12, 2013

Jorge Estrada
El Paso Police Department
911 N Raynor
El Paso, TX 79903

Laboratory # ELP-1211-01637
Agency # 12152050
County El Paso
Offense Date 05/31/2012

**Suspect(s):** SOLIS-GONZALEZ, Luis (DOB 04/18/77)

**Victim(s):** SALDIVAR, Marysol (DOB 05/06/78)
H██ O██████ (DOB ████)
DESANTIAGO, Eric (DOB 12/29/69)

**Elimination(s):** S██████ L██ A███ (DOB ████)

**Submission Information:**

01 - Properly Sealed Large Brown Box on November 12, 2012 by Estrada, Jorge VIA In Person

**Requested Analysis:** Perform forensic DNA analysis.

Please refer to a previous Forensic Biology report issued on May 9, 2013.

## Evidence Description, Results of Analysis and Interpretation:

Portions of the items were extracted by a method which yields DNA.

The DNA isolated was analyzed using STR (Short Tandem Repeat) PCR (Polymerase Chain Reaction) analysis. The following loci were examined: D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, Amelogenin, D5S818, and FGA.

**01-01-AA-01-AA : DNA extract of swab from handle of kitchen knife on kitchen counter (agency exhibit JE02)**

The DNA profile is consistent with a mixture. Mr. Desantiago and Mr. Solis-Gonzalez cannot be excluded as contributors to the profile. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 9.488 million for Caucasians, 1 in 28.79 million for Blacks, and 1 in 4.191 million for Hispanics. The approximate world population is 7.0 billion. Marysol Saldivar, L██ A███ S██████, and Ms. H██ are excluded as contributors to this profile.

**01-01-AA-02-AA : DNA extract of swab from blade of kitchen knife from kitchen counter (agency exhibit JE02)**

The DNA profile is consistent with a mixture. Mr. Desantiago cannot be excluded as the contributor of the major component in this profile. The probability of selecting an unrelated person at random who could be the source of the major component in this profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Desantiago is the source of the major component of

this profile (excluding identical twins). Due to the low level of data, no DNA comparisons will be made to the minor component. Marysol Saldivar, Luis Angel Saldivar, Mr. Solis-Gonzalez, and Ms. H███ are excluded as contributors to the major component of this profile.

### 01-02-AA-01-AA : DNA extract of swab of blade from small kitchen knife in upstairs restroom (agency exhibit JE69)

The DNA profile is consistent with a mixture. Mr. Desantiago cannot be excluded as a contributor to the profile all the STR loci. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 16.69 million for Caucasians, 1 in 40.49 million for Blacks, and 1 in 6.369 million for Hispanics. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D18S51, D5S818, and FGA. At these loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 3.744 million for Caucasians, 1 in 4.634 million for Blacks, and 1 in 2.335 million for Hispanics. The approximate world population is 7.0 billion. Marysol Saldivar, L██ A██ S█████ and Ms. H███ are excluded as contributors to this profile.

### 01-02-AA-02-AA : DNA extract of swab of handle from small kitchen knife in upstairs restroom (agency exhibit JE69)

The partial DNA profile is consistent with a mixture. Mr. Desantiago cannot be excluded as a contributor to the profile at the STR loci D8S1179, D3S1358, and D19S433. At these loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 21 for Caucasians, 1 in 26 for Blacks, and 1 in 12 for Hispanics. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D3S1358, D19S433, and D5S818. At these loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 11,810 for Caucasians, 1 in 13,090 for Blacks, and 1 in 11,960 for Hispanics. The approximate world population is 7.0 billion. Marysol Saldivar, L██ A██ S█████ and Ms. H███ are excluded as contributors to this profile.

### 01-03-AA-01-AA : DNA extact of swab of handle from black knife on kitchen floor (agency exhibit JE04)

The DNA profile is consistent with a mixture. Mr. Desantiago cannot be excluded as a contributor to the profile at all the STR loci. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 208 million for Caucasians, 1 in 655.7 million for Blacks, and 1 in 87.26 million for Hispanics. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D7S820, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D5S818, and FGA. At these loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 376,800 for Caucasians, 1 in 311,200 for Blacks, and 1 in 175,300 for Hispanics. The approximate world population is 7.0 billion. Marysol Saldivar, L██ A██ S█████, and Ms. H███ are excluded as contributors to this profile.

### 01-04-AA-01-AA : DNA extract of swab of blade from knife in kitchen sink (agency exhibit JE38)

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Desantiago is the source of this profile (excluding identical twins).

### 01-12-AA-02-AA : DNA extract of stain from blue jeans in C███████ room (agency exhibit JE72)

The DNA profile is consistent with the DNA profile of Mr. Solis-Gonzalez. Mr. Solis-Gonzalez cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 1.57 sextillion for

Caucasians, 1 in 2.15 sextillion for Blacks, and 1 in 296.4 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Solis-Gonzalez is the source of this profile (excluding identical twins).

**01-14-AA-02-AA : DNA extract of stain from shoe lace from upstairs restroom (agency exhibit JE68)**

The DNA profile is consistent with a mixture. Due to the potential number of contributors, no interpretations will be made for the DNA profile.

**01-22-AA-01-AB-AA : DNA extract of stain from right Nike shoe from Luis Solis-Gonzalez (agency exhibit 5208670)**

The DNA profile is consistent with a mixture. Mr. Desantiago and Marysol Saldivar cannot be excluded as contributors to the profile. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 523 million for Caucasians, 1 in 2.582 billion for Blacks, and 1 in 91.58 million for Hispanics. The approximate world population is 7.0 billion. L▇ A▇ S▇ Ms.H▇, and Mr. Solis-Gonzalez are excluded as contributors to this profile.

**01-23-AA-03-AA : DNA extract of stain from black t-shirt from Luis Solis-Gonzalez (agency exhibit BM03)**

The DNA profile is consistent with the DNA profile of Mr. Solis-Gonzalez. Mr. Solis-Gonzalez cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 1.577 sextillion for Caucasians, 1 in 2.15 sextillion for Blacks, and 1 in 296.4 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Solis-Gonzalez is the source of this profile (excluding identical twins).

**01-24-AA-02-AA : DNA extract of stain from Mickey Mouse baseball cap (agency exhibit MM01)**

The DNA profile is consistent with the DNA profile of Marysol Saldivar. Marysol Saldivar cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 17.77 sextillion for Caucasians, 1 in 1.324 septillion for Blacks, and 1 in 3.394 sextillion for Hispanics. To a reasonable degree of scientific certainty, Marysol Saldivar is the source of this profile (excluding identical twins).

**01-27-AA-01-AA : DNA extract of stain from tissue paper from inside of Nissan Titan (agency exhibit JE113)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Desantiago is the source of this profile (excluding identical twins).

**01-28-AA-02-AA : DNA extract of stain from front of blue jeans from Luis Solis-Gonzalez (agency exhibit BM01)**

The DNA profile is consistent with a mixture. Mr. Desantiago cannot be excluded as the contributor of the major component in this profile. The probability of selecting an unrelated person at random who could be the source of the major component in this profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Desantiago is the source of the major component of this profile (excluding identical twins). Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the loci D8S1179, D21S11, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, and D5S818. At these loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 2,838 for Caucasians, 1 in 6,131 for Blacks, and 1 in 2,865 for Hispanics. The approximate world population is 7.0 billion. Marysol Saldivar, L▇ S▇, and Ms. H▇ are excluded as contributors to this profile.

**01-29-AA-01 :** DNA extract of known blood from C███████ H██ (agency exhibit JE82)
The DNA profile was used for comparison.

**01-30-AA-01 :** DNA extract of known blood card from Marysol Saldivar (agency exhibit JE58)
The DNA profile was used for comparison.

**01-31-AA-01 :** DNA extract of known blood from Eric Desantiago (agency exhibit JE98)
The DNA profile was used for comparison.

**01-32-AA-01 :** DNA extract of left buccal swab from L██ A███ S██████ (agency exhibit MM-A)
The DNA profile was used for comparison.

**01-34-AA-01 :** DNA extract of buccal swab from Luis Solis-Gonzalez (agency exhibit 5210932)
The DNA profile was used for comparison.

### Investigative Leads:

A DNA profile obtained from blue jeans in C███████ H██ room (01-12-AA) has been entered into the COmbined DNA Index System (CODIS).

The presence of probative DNA evidence may not require that the previously submitted / preserved trace evidence be examined. For more information about Trace evidence analysis and how it may aid in the investigation, please contact the laboratory.

### Disposition:

The swab from the knife blade (01-01-AA-02), the swab from the knife handle (01-01-AA-01), the swab from the small knife blade (01-02-AA-01), the swab from the small knife handle (01-02-AA-02), the swab from the black knife handle (01-03-AA-01), the swab from the knife blade in kitchen sink (01-04-AA-01), the swab from the right Nike shoe from Luis Solis-Gonzalez (01-22-AA-01-AB), and the stain from the front of Mr. Solis-Gonzalez's blue jeans (1-28-AA-02) were depleted during the DNA analysis. The previously collected swabs and the resulting DNA extracts are being retained by this laboratory. Please make arrangements to pick up the remaining bulk evidence at your earliest convenience.

This report has been electronically prepared and approved by:

Nicolas Ronquillo
DNA Technical Leader
Texas DPS El Paso Crime Laboratory



Page    of 4



# TEXAS DEPARTMENT OF PUBLIC SAFETY

CRIME LABORATORY
11612 Scott Simpson
El Paso, TX 79936
Voice 915-849-4120  Fax 915-849-4113
ElPasoCrimeLab@dps.texas.gov



STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
CHERYL MacBRIDE
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
CARIN MARCY BARTH
MANNY FLORES
STEVEN P. MACH
RANDY WATSON

## Supplemental DNA Laboratory Report
Issue Date:  April 29, 2014

Jorge Estrada
El Paso Police Department
911 N Raynor
El Paso, TX 79903

**Laboratory #**  ELP-1211-01637
**Agency #**  12152050
**County**  El Paso
**Offense Date**  05/31/2012

**Suspect(s):**  SOLIS-GONZALEZ, LUIS (DOB 04/18/1977)

**Victim(s):**  SALDIVAR, MARYSOL (DOB 05/06/1978)
H█████, C████████A (DOB ████████)
DESANTIAGO, ERIC (DOB 12/29/1969)

**Elimination(s):**  S████████ L███ A████ (DOB ████████)

**Submission Information:**

01 - Properly Sealed Large Brown Box on November 12, 2012 by Estrada, Jorge VIA In Person

**Requested Analysis:** Perform forensic DNA analysis.

This is a supplemental report. Please refer to the previous reports issued by Nicolas Ronquillo on May 9, 2013 and August 12, 2013. Items 01-29-AA-01, 01-30-AA-01, 01-31-AA-01, 01-32-AA-01, and 01-34-AA-01 were previously extracted by Nicolas Ronquillo.

**Evidence Description, Results of Analysis and Interpretation:**

Portions of the items were extracted by a method which yields DNA.

The DNA isolated was analyzed using STR (Short Tandem Repeat) PCR (Polymerase Chain Reaction) analysis. The following loci were examined: D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, Amelogenin, D5S818, and FGA.

**01-05-AA-01-AA : DNA extract of toilet paper from Marysol Saldivar's crotch area (Item JE17)**

The partial DNA profile is consistent with a mixture. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D3S1358, D16S539, D19S433, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 30.29 million for Caucasians, 1 in 304.5 million for Blacks, and 1 in 17.05 million for Hispanics. The approximate world population is 7.0 billion.

Ms. Holt, Mr. Desantiago, Ms. Saldivar, and Luis Saldivar are excluded as contributors to this profile.

**01-06-AA-02-AA : DNA extract of apparent blood stain from duct tape from upstairs bath tub (Item JE24)**

The partial DNA profile is consistent with a mixture. Mr. Desantiago cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D7S820, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an



unrelated person at random who could be a contributor to this profile is approximately 1 in 930.2 million for Caucasians, 1 in 4.193 billion for Blacks, and 1 in 12.22 billion for Hispanics.

Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the STR loci D21S11, D3S1358, D16S539, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 33 for Caucasians, 1 in 64 for Blacks, and 1 in 28 for Hispanics. The approximate world population is 7.0 billion.

Ms. H███ L██ S█████ and Ms. Saldivar are excluded as contributors to this profile.

**01-06-AA-03-AA : DNA extract of swab for epithelial cells from duct tape from upstairs bath tub (Item JE24)**
No interpretable DNA profiles were obtained.

**01-07-AA-01-AA : DNA extract of stain 1 from piece of duct tape with toilet paper inside and under hamper (Item JE20)**
The DNA profile is consistent with a mixture. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D18S51, D5S818, and FGA. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 46.45 billion for Caucasians, 1 in 38.73 billion for Blacks, and 1 in 27.93 billion for Hispanics.

Mr. Desantiago cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D3S1358, TH01, D16S539, and vWA. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 593 for Caucasians, 1 in 1,210 for Blacks, and 1 in 298 for Hispanics. The approximate world population is 7.0 billion.

Ms. H██, Ms. Saldivar and L██ S█████ are excluded as contributors to this profile.

**01-07-AA-02-AA : DNA extract of stain 2 from piece of duct tape inside and under hamper (Item JE20)**
The partial DNA profile is consistent with a mixture. Ms. H██ cannot be excluded as a contributor to the profile at the STR loci D8S1179, TH01, D16S539, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 446 for Caucasians, 1 in 428 for Blacks, and 1 in 204 for Hispanics.

Mr. Desantiago cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D7S820, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 13.67 million for Caucasians, 1 in 20.39 million for Blacks, and 1 in 4.805 million for Hispanics.

Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D3S1358, D16S539, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 700 for Caucasians, 1 in 1,351 for Blacks, and 1 in 445 for Hispanics.

Ms. Saldivar cannot be excluded as a contributor to the profile at the STR loci D8S1179, TH01, D16S539, D19S433, vWA, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 535 for Caucasians, 1 in 680 for Blacks, and 1 in 724 for Hispanics.

L█ S█ cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D16S539, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 337 for Caucasians, 1 in 916 for Blacks, and 1 in 293 for Hispanics. The approximate world population is 7.0 billion.

**01-07-AA-03-AA : DNA extract of stain 3 from piece of duct tape inside and under hamper (Item JE20)**

No DNA profiles were obtained.

**01-08-AA-02-AA : DNA extract of swab of stain on inside of duct tape core from L█ A█ S█ room (Item JE30)**

The DNA profile is consistent with a mixture. Both Mr. Desantiago and Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 9.488 million for Caucasians, 1 in 28.79 million for Blacks, and 1 in 4.191 million for Hispanics. The approximate world population is 7.0 billion.

Ms. H█, Ms. Saldivar, and L█ S█ are excluded as contributors to this profile.

**01-09-AA-02-AA : DNA extract of swab from stain on duct tape from kids bag with toys from L█ A█ S█ room (Item JE28)**

The DNA profile is consistent with a mixture. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 676,600 for Caucasians, 1 in 3.309 million for Blacks, and 1 in 230,500 for Hispanics.

Mr. Desantiago cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D5S818, and FGA. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 73,310 for Caucasians, 1 in 305,500 for Blacks, and 1 in 17,280 for Hispanics.

Ms. Saldivar cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D7S820, CSF1PO, TH01, D13S317, D16S539, D19S433, vWA, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 898 for Caucasians, 1 in 2,715 for Blacks, and 1 in 451 for Hispanics.

Ms. H█ cannot be excluded as a contributor to the profile at the STR loci D8S1179, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 4,819 for Caucasians, 1 in 16,540 for Blacks, and 1 in 1,748 for Hispanics.

L█ S█ cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D7S820, CSF1PO, TH01, D13S317, D16S539, D19S433, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 4,892 for Caucasians, 1 in 10,170 for Blacks, and 1 in 2,667 for Hispanics. The approximate world population is 7.0 billion.

**01-10-AA-02-AA : DNA extract of stain from makeshift finger cast next to vacuum outside of upstairs restroom (Item JE34)**

The DNA profile is consistent with a mixture. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 85.84 trillion for Caucasians, 1 in 310.3 trillion for

Blacks, and 1 in 60.57 trillion for Hispanics.

Mr. Desantiago cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, and TH01. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 34 for Caucasians, 1 in 34 for Blacks, and 1 in 19 for Hispanics. The approximate world population is 7.0 billion.

Ms. H█ Ms. Saldivar, L█ S█████r are excluded as contributors to this profile.

**01-11-AA-01-AA : DNA extract of swab from finger splint from C████████ H██ room next to bed (Item JE66)**

The DNA profile is consistent with the DNA profile of Mr. Solis-Gonzalez. Mr. Solis-Gonzalez cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 1.577 sextillion for Caucasians, 1 in 2.15 sextillion for Blacks, and 1 in 296.4 quintillion for Hispanics. To a reasonable degree of scientific certainty, Luis Solis-Gonzalez is the source of this profile (excluding identical twins).

**01-13-AA-02-AA : DNA extract of swab from stain on left Jordan tennis shoe from L██ A██ S█████ room (Item JE70)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Eric Desantiago is the source of this profile (excluding identical twins).

**01-15-AA-02-AA : DNA extract of stain from white t-shirt from upstairs restroom floor (Item JE22)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Eric Desantiago is the source of this profile (excluding identical twins).

**01-15-AA-03-AA : DNA extract of swab from collar of shirt from upstairs restroom floor (Item JE22)**

The partial DNA profile is consistent with a mixture. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile at the STR loci D8S1179, D21S11, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D5S818, and FGA. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 21.12 billion for Caucasians, 1 in 42.63 billion for Blacks, and 1 in 10.19 billion for Hispanics. The approximate world population is 7.0 billion.

Ms. H█ Ms. Saldivar, L██ S█████ and Mr. Desantiago are excluded as contributors to this profile.

**01-15-AB-02-AA : DNA extract of stain from pair of white socks from upstairs restroom floor (Item JE22)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Eric Desantiago is the source of this profile (excluding identical twins).

**01-16-AA-01 : DNA extract of swabbing from milk gallon in L██ A██ S█████ room (Item JEA3)**

No DNA profiles were obtained.

**01-17-AA-01-AA-AA : DNA extract of stain from duct tape from Eric Desantiago's head (Item JE99)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Eric Desantiago is the source of this profile (excluding identical twins).

**01-17-AB-01-AB-AA : DNA extract of stain from rag removed from Eric Desantiago's head (item JE99)**

The partial DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile at the STR loci D8S1179, D21S11, D3S1358, and TH01. At these loci, the probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 3,737 for Caucasians, 1 in 49,410 for Blacks, and 1 in 2,603 for Hispanics. The approximate world population is 7.0 billion.

Ms. Holt, Ms. Saldivar, L███ S███ and Mr. Solis-Gonzalez are excluded as contributors to this profile.

**01-18-AA-01-AA : DNA extract of swab from right hand fingernail clippings from Eric Desantiago (Item JE94)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Eric Desantiago is the source of this profile (excluding identical twins).

**01-19-AA-01-AA : DNA extract of swab from left hand fingernail clippings from Eric Desantiago (item JE95)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Eric Desantiago is the source of this profile (excluding identical twins).

**01-20-AA-01-AA : DNA extract of swab from right hand fingernail clippings from C███████ H██ (Item JE78)**

The DNA profile is consistent with a mixture. Mr. Solis-Gonzalez cannot be excluded as a contributor to the profile. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 21.82 trillion for Caucasians, 1 in 38.34 trillion for Blacks, and 1 in 3.932 trillion for Hispanics.

Ms. H██ cannot be excluded as a contributor to the profile at the STR loci D8S1179, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, and D5S818. At these STR loci, the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 2.436 million for Caucasians, 1 in 2.641 million for Blacks, and 1 in 668,000 for Hispanics. The approximate world population is 7.0 billion.

Ms. Saldivar, L██ S██████ and Mr. Desantiago are excluded as contributors to this profile.

**01-22-AB-01-AB-AA : DNA extract of stain from left Nike shoe from Luis Solis-Gonzalez (item 5208670)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Eric Desantiago is the source of this profile (excluding identical twins).

**01-23-AA-02-AA : DNA extract of stain from black t-shirt from Luis Solis-Gonzalez (Item BM03)**

The DNA profile is consistent with the DNA profile of Ms. Saldivar. Ms. Saldivar cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 17.77 sextillion for Caucasians, 1 in 1.324 septilion for Blacks, and 1 in 3.394 sextillion for Hispanics. To a reasonable degree of scientific certainty, Marysol Saldivar is the source of this profile (excluding identical twins).

**01-25-AA-01-AA-AA : DNA extract of swab from Marysol Saldivar's right fingernail clippings (Item JE57)**

The DNA profile is consistent with the DNA profile of Ms. Saldivar. Ms. Saldivar cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 17.77 sextillion for Caucasians, 1 in 1.324 septilion for Blacks, and 1 in 3.394 sextillion for Hispanics. To a reasonable degree of scientific certainty, Marysol Saldivar is the source of this profile (excluding identical twins).

**01-25-AB-01-AA-AA : DNA extract of swab from left fingernail clippings from Marysol Saldivar (Item JE57)**

The DNA profile is consistent with the DNA profile of Ms. Saldivar. Ms. Saldivar cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 17.77 sextillion for Caucasians, 1 in 1.324 septilion for Blacks, and 1 in 3.394 sextillion for Hispanics. To a reasonable degree of scientific certainty, Marysol Saldivar is the source of this profile (excluding identical twins).

**01-28-AA-03-AA : DNA extract of stain from back of blue jeans from Luis Solis-Gonzalez (Item BM01)**

The DNA profile is consistent with the DNA profile of Mr. Desantiago. Mr. Desantiago cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 2.574 quintillion for Caucasians, 1 in 263.6 quintillion for Blacks, and 1 in 2.729 quintillion for Hispanics. To a reasonable degree of scientific certainty, Eric Desantiago is the source of this profile (excluding identical twins).

**01-29-AA-01 : DNA extract of known blood from C▮▮▮▮▮ H▮▮ (agency exhibit JE82)**

The DNA profile was used for comparison.

**01-30-AA-01 : DNA extract of known blood card from Marysol Saldivar (agency exhibit JE58)**

The DNA profile was used for comparison.

**01-31-AA-01 : DNA extract of known blood from Eric Desantiago (agency exhibit JE98)**

The DNA profile was used for comparison.

**01-32-AA-01 : DNA extract of left buccal swab from L▮▮ A▮▮ S▮▮▮▮ (agency exhibit MM-A)**

The DNA profile was used for comparison.

**01-34-AA-01 : DNA extract of buccal swab from Luis Solis-Gonzalez (agency exhibit 5210932)**

The DNA profile was used for comparison.

## Disposition:

The swab from the duct tape for epithelial cells, the swab from the stain on the duct tape from kid's bag with toys, the stain from the makeshift finger cast, the swab from H▮▮ right fingernail clippings, and the stain from back of jeans were depleted during DNA analysis. The remaining stains and resulting DNA extracts will be stored to preserve the biological constituents. The bulk evidence was returned to Luis Sarmiento on 8/22/13.

| Laboratory Case Number | Agency Case Number | Offense Date |
|---|---|---|
| ELP-1211-01637 | 12152050 | 05/31/2012 |

This report has been electronically prepared and approved by:

Christine Ceniceros
Forensic Scientist IV
Texas DPS El Paso Crime Laboratory



# TEXAS DEPARTMENT OF PUBLIC SAFETY





CRIME LABORATORY
11612 Scott Simpson
El Paso, TX 79936
Voice 915-849-4120  Fax 915-849-4113
ElPasoCrimeLab@dps.texas.gov

STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
CHERYL MacBRIDE
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
MANNY FLORES
FAITH JOHNSON
STEVEN P. MACH
RANDY WATSON

## Laboratory Case Number: ELP-1211-01637

### Supplemental Forensic Biology Laboratory Report
Issue Date:  June 13, 2014

Jorge Estrada
El Paso Police Department
911 N Raynor
El Paso, TX 79903

**Agency Case Information:**       El Paso Police Department - 12152050

**Offense Information:**      Homicide - 05/31/2012 - El Paso County

**Suspect(s):**      SOLIS-GONZALEZ, LUIS (DOB 04/18/1977)

**Victim(s):**      SALDIVAR, MARYSOL (DOB 05/06/1978)

H███, C█████████ (DOB█████)

DESANTIAGO, ERIC (DOB 12/29/1969)

**Elimination(s):**     S█████, L██ A████ (DOB█████)

**Submission Information:**

22 - Large Brown Box on April 01, 2014 by Estrada, Jorge VIA In Person

<u>Requested Analysis:</u>  Screen for biological evidence.

This is a supplemental Forensic Biology report.  Please refer to the most recent previous report issued on April 29, 2014 by Christine Ceniceros.  A reference to other reports is also mentioned on that report.

<u>Evidence Description, Results of Analysis and Interpretation:</u>

22 : Large Brown Box

**22-01-AA : Polo shirt from autopsy of Eric Desantiago (Item JE85)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**22-02-AA : Grey tank top from autopsy of Eric Desantiago (Item JE86)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**22-03-AA : Mens navy blue briefs from autopsy of Eric Desantiago (Item JE87)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**22-04-AA : Khaki pants with black belt from autopsy of Eric Desantiago (Item JE88)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**22-05-AA : Pair of brown socks from autopsy of Eric Desantiago (Item JE89)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**22-06-AA : Pair of Brahma work boots from autopsy of Eric Desantiago (Item JE90)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**22-07-AA : Black wallet from autopsy of Eric Desantiago (Item JE91)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-08-AA : Blackberry cell phone with holster from autopsy of Eric Desantiago (Item JE92)**

Apparent blood was detected on cell phone holster. No stains having the appearence of blood were observed on the cell phone. Trace evidence was collected from the cell phone holster. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-09 : White envelope from medical examiner's office labeled pulled head hair from Eric Desantiago (Item JE93)**

No analysis was performed.

**22-10-AA : Brown paper bag removed from Eric Desantiago's right hand at autopsy (Item JE96)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-11-AA : Brown paper bag removed from Eric Desantiago's left hand at autopsy (Item JE97)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-12-AA : White sheet removed from body bag at autopsy of Eric Desantiago (Item JE100)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-13-AA : Lip balm (Soft Lips) from autopsy of Eric Desantiago (Item JE101)**

Apparent blood was detected.

**22-14-AA : Purple tank top from autopsy of C█████████ H██ (Item JE73)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-15-AA : Purple bra from autopsy of C█████████ H██ (Item JE74)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-16-AA : Pink panties from autopsy of C█████████ H██ (Item JE75)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-17-AA : Blue socks from autopsy of C█████████ H██ (Item JE76)**

No blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**22-18 : White envelope from medical examiner's office labeled pulled head hair from C█████████ H██ (Item JE77)**

No analysis was performed.

**22-19-AA : Brown paper bag removed from C█████████ H██ right hand at autopsy (Item JE80)**

No stains having the appearance of blood were observed.

**22-20-AA : Brown paper bag removed from C█████████ H██ left hand at autopsy (Item JE81)**

No blood was detected.

**22-21-AA : Possible duct tape adhesive from autopsy of C█████████ H██ (Item JE84)**

Sample was collected for possible DNA analysis.

### Investigative Leads and Requirements for Further Analysis:

This is a preliminary report. A separate report will be issued upon completion of DNA analysis.

### Disposition:

Stains from items 22-01-AA through 22-08-AA, 22-10-AA through 22-16-AA and 22-21-AA are being retained to preserve biological constituents. The remaining evidence will be retained by this laboratory.



pending completion of Forensic Biology analysis.

This report has been electronically prepared and approved by:

Cathey L. Serrano
Forensic Scientist III
Texas DPS El Paso Crime Laboratory





# TEXAS DEPARTMENT OF PUBLIC SAFETY

CRIME LABORATORY
11612 Scott Simpson
El Paso, TX 79936
Voice 915-849-4120 Fax 915-849-4113
ElPasoCrimeLab@dps.texas.gov



STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
CHERYL MacBRIDE
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
MANNY FLORES
FAITH JOHNSON
STEVEN P. MACH
RANDY WATSON

**Laboratory Case Number: ELP-1211-01637**

## Supplemental Forensic Biology Laboratory Report
Issue Date: June 17, 2014

Jorge Estrada
El Paso Police Department
911 N Raynor
El Paso, TX 79903

**Agency Case Information:** El Paso Police Department - 12152050

**Offense Information:** Homicide - 05/31/2012 - El Paso County

**Suspect(s):** SOLIS-GONZALEZ, LUIS (DOB 04/18/1977)

**Victim(s):** SALDIVAR, MARYSOL (DOB 05/06/1978)

H███, C█████████ (DOB █████)

DESANTIAGO, ERIC (DOB 12/29/1969)

**Elimination(s):** S██████, L██ A███ (DOB █████)

**Submission Information:**

25 - Large Brown Paper Bag on April 02, 2014 by Estrada, Jorge VIA In Person

27 - Large Brown Box on April 02, 2014 by Estrada, Jorge VIA In Person

<u>Requested Analysis:</u> Screen for biological evidence.

This is a supplemental Forensic Biology Laboratory Report. Please refer to the most recent previous report issued on June 13, 2014 by Cathey L. Serrano. A reference to other reports is also mentioned on that report.

<u>Evidence Description, Results of Analysis and Interpretation:</u>

**25 : Large Brown Paper Bag**

**25-01 : Dust pan from residence (Item MCV-37)**

No visible bloodstains were observed. The item was swabbed for potential DNA.

**25-02-AA : Debris from dust pan from residence (Item MCV-37)**

No blood was detected.

**27 : Large Brown Box**

**27-01-AA : Blue and gray tennis shoes from L██ A███ S█████ (Item MM02)**

No blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-02-AA : Spiderman socks from L██ A███ S█████ (Item MM03)**

No visible bloodstains were observed. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-03-AA : "Toy Story" themed boys underwear from L██ A███ S█████ (Item MM04)**

No visible bloodstains were observed. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-04-AA : Red pajama pant from L██ A███ S█████ (Item MM05)**

No blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-05-AA : Black "Angry Birds" theme t-shirt from L███ A███ S███████(Item MM06)**

A presumptive test indicates the presence of blood. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-06-AA : Blue "Angry Birds" theme t-shirt from L███ A███ S███████ (Item MM07)**

No blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-07 : Envelope containing swab from inside baseball cap MM01 (Item MM-C)**

No analysis was performed beacause the item was previously analyzed.

**27-08-AA : Blue with yellow stripes polo shirt from suspect Solis-Gonzalez (Item BM02)**

No visible bloodstains were observed. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-09 : Envelope containing swabs from pants from Solis-Gonzalez BM01 (Item BMA)**

No analysis was performed because the item was previously analyzed.

**27-10 : Envelope containing swabs from pants from Solis-Gonzalez BM01 (Item BMB)**

No analysis was performed because the item was previously analyzed.

**27-11 : Envelope containing swabs from pants from Solis-Gonzalez BM01 (Item BMC)**

No analysis was performed because the item was previously analyzed.

**27-12 : Envelope containing swabs from pants from Solis-Gonzalez BM01 (Item BMD)**

No analysis was performed because the item was previously analyzed.

**27-13 : Envelope containing swabs from pants from Solis-Gonzalez BM01 (Item BME)**

No analysis was performed because the item was previously analyzed.

**27-14 : Envelope containing swabs from pants from Solis-Gonzalez BM01 (Item BMF)**

No analysis was performed because the item was previously analyzed.

**27-15 : Envelope containing swabs from pants from Solis-Gonzalez BM01 (Item BMG)**

No analysis was performed because the item was previously analyzed.

**27-16 : Envelope containing swabs from left Nike shoe 5208670 from Solis-Gonzalez (Item BMH)**

No analysis was performed because the item was previously analyzed.

**27-17 : Envelope containing swabs from left Nike shoe 5208670 from Solis-Gonzalez (Item BMI)**

No analysis was performed because the item was previously analyzed.

**27-18 : Envelope containing swabs from left Nike shoe 5208670 from Solis-Gonzalez (Item BMJ)**

No analysis was performed because the item was previously analyzed.

**27-19 : Envelope containing swabs from left Nike shoe 5208670 from Solis-Gonzalez (Item BMK)**

No analysis was performed because the item was previously analyzed.

**27-20 : Envelope containing swabs from left Nike shoe 5208670 from Solis-Gonzalez (Item BML)**

No analysis was performed because the item was previously analyzed.

**27-21 : Envelope containing swabs from left Nike shoe 5208670 from Solis-Gonzalez (Item BMM)**

No analysis was performed because the item was previously analyzed.

**27-22 : Envelope containing swabs from left Nike shoe 5208670 from Solis-Gonzalez (Item BMN)**

No analysis was performed because the item was previously analyzed.

**27-23 : Envelope containing swabs from right Nike shoe 5208670 from Solis-Gonzalez (Item BMO)**

No analysis was performed because the item was previously analyzed.

**27-24 : Envelope containing swabs from right Nike shoe 5208670 from Solis-Gonzalez (Item BMP)**

No analysis was performed because the item was previously analyzed.

**27-25 : Envelope containing swabs from right Nike shoe 5208670 from Solis-Gonzalez (Item BMQ)**

No analysis was performed because the item was previously analyzed.

**27-26 : Envelope containing swabs from right Nike shoe 5208670 from Solis-Gonzalez (Item BMR)**

No analysis was performed because the item was previously analyzed.

**27-27 : Envelope containing swabs from right Nike shoe 5208670 from Solis-Gonzalez (Item BMS)**

No analysis was performed because the item was previously analyzed.

**27-28 : Envelope containing swabs from right Nike shoe 5208670 from Solis-Gonzalez (Item BMT)**

No analysis was performed because the item was previously analyzed.

**27-29 : Envelope containing swabs from right Nike shoe 5208670 from Solis-Gonzalez (Item BMU)**

No analysis was performed because the item was previously analyzed.

**27-30-AA : Ankle bracelet from Holt's autopsy (Item JE83)**

No visible bloodstains were observed.

**27-31-AA : Black cloth belt from Solis-Gonzalez (Item 5208673)**

No visible bloodstains were observed. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-32-AA : Pantech cell phone from Solis-Gonzalez (Item ML-02)**

No visible bloodstains were observed.

**27-33-AA : Blue tin cup from residence (Item JE62)**

Samples were collected for possible DNA analysis. No visible bloodstains were observed.

**27-34-AA : Mazola oil bottle from residence (Item JE63)**

Samples were collected for possible DNA analysis. No visible bloodstains were observed.

**27-35-AA : 3L Diet Coke plastic bottle from residence (Item JE71)**

Samples were collected for possible DNA analysis. No visible bloodstains were observed.

**27-36-AA : Necklace with heart pendant from M. Saldivar's autopsy (Item JE52)**

A presumptive test indicates the presence of blood. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-37-AA : Bracelet from M. Saldivar's autopsy (Item JE53)**

A presumptive test indicates the presence of blood. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-38-AA : Ear ring from M. Saldivar's autopsy (item JE54)**

A presumptive test indicates the presence of blood.

**27-39 : Envelope containing swabs of black t-shirt BM03 from Solis-Gonzalez (Item BMV)**

No analysis was performed because the item was previously analyzed.

**<u>Investigative Leads and Requirements for Further Analysis:</u>**

A separate report will be issued upon completion of DNA analysis.

**<u>Disposition:</u>**

Swabs from items 25-01 handle, 27-33-AA, 27-34-AA, 27-35-AA, 27-36-AA, 27-37-AA, 27-38-AA and a stain from item 27-05-AA will be stored to preserve the biological constituents. The remaining evidence will be retained by this laboratory pending completion of Forensic Biology analysis.

This report has been electronically prepared and approved by:

Christine Ceniceros
Forensic Scientist IV
Texas DPS El Paso Crime Laboratory







STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
CHERYL MacBRIDE
DEPUTY DIRECTORS

# TEXAS DEPARTMENT OF PUBLIC SAFETY

CRIME LABORATORY
11612 Scott Simpson
El Paso, TX 79936
Voice 915-849-4120  Fax 915-849-4113
ElPasoCrimeLab@dps.texas.gov

COMMISSION
A. CYNTHIA LEON, CHAIR
MANNY FLORES
FAITH JOHNSON
STEVEN P. MACH
RANDY WATSON

## Laboratory Case Number: ELP-1211-01637

### Supplemental Forensic Biology Laboratory Report

Issue Date:   July 17, 2014

Jorge Estrada
El Paso Police Department
911 N Raynor
El Paso, TX 79903

**Agency Case Information:**     El Paso Police Department - 12152050

**Offense Information:**     Homicide (SB 1292) - 05/31/2012 - El Paso County

**Suspect(s):**     SOLIS-GONZALEZ, LUIS (DOB 04/18/1977)

**Victim(s):**     SALDIVAR, MARYSOL (DOB 05/06/1978)

H▆▆, C▆▆▆▆▆▆ (DOB ▆▆▆▆▆)

DESANTIAGO, ERIC (DOB 12/29/1969)

**Elimination(s):**     S▆▆▆, L▆ A▆▆ (DOB ▆▆▆▆▆)

**Submission Information:**

23 - Large Brown Box on April 01, 2014 by Estrada, Jorge VIA In Person

<u>Requested Analysis:</u>  Screen for biological evidence.

This is a supplemental Forensic Biology Report.  Please refer to the most recent previous report issued on June 17, 2014 by Christine Ceniceros.  A reference to other reports is also mentioned on that report.

<u>Evidence Description, Results of Analysis and Interpretation:</u>

**23 : Large Brown Box**

**23-01-AA : "Goodness" oven mitten from kitchen sink at crime scene (Item JE06)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**23-02-AA : Table runner from crime scene (Item JE08)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**23-03-AA : Red and black checkered blanket from crime scene (Item JE09)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**23-04-AA : Left "Predictions" high heel shoe from crime scene (Item JE11A)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**23-05-AA : White bath towel with pink trim from crime scene (Item JE13)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

**23-06-AB : White hand towel from crime scene (Item JE13)**

Apparent blood was detected.  Trace evidence was collected.  The collected trace evidence has been packaged with the evidence.  No further analysis was conducted at this time.

TxDPS 08.05.14

**23-06-AA : "Disney" bath towel from crime scene (item JE14)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**23-07-AA : Left navy blue kids sandal from crime scene (item JE15)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**23-08-AA : Two "Lowes" plastic bags stuck together from crime scene (JE18)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**23-09-AA : "Wilde" pliers from crime scene (item JE21)**

No blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**23-10-AA : "Winnie the Pooh" bath towel from crime scene (item JE23)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**23-11-AA : Black "TNT" t-shirt from crime scene (JE23A)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time. The item was swabbed for potential wearer's DNA.

**23-12-AA : White hand towel from closet under stairs (item JE26)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**23-13-AA : Right "Predictions" high heel shoe from crime scene (JE45)**

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

## Investigative Leads and Requirements for Further Analysis:

A separate report will be issued upon completion of DNA analysis.

## Disposition:

Stains from items 23-01-AA to 23-08-AA, 23-05-AB and 23-10-AA to 23-13-AA were retained to preserve biological constituents. The remaining evidence submitted on April 1, 2014 and the dust pan (item MCV 37) submitted on April 2, 2014 was returned to Officer Ruben Villareal on July 1, 2014.

This report has been electronically prepared and approved by:

Cathey L. Serrano
Forensic Scientist
Texas DPS El Paso Crime Laboratory





# TEXAS DEPARTMENT OF PUBLIC SAFETY

CRIME LABORATORY
11612 Scott Simpson
El Paso, TX 79938
Voice 915-849-4120 Fax 915-849-4113
ElPasoCrimeLab@dps.texas.gov



STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
MANNY FLORES
FAITH JOHNSON
STEVEN P. MACH
RANDY WATSON

**Laboratory Case Number: ELP-1211-01637**

## Supplemental Forensic Biology Laboratory Report
Issue Date: September 19, 2014

Jorge Estrada
El Paso Police Department
911 N Raynor
El Paso, TX 79903

**Agency Case Information:**   El Paso Police Department - 12152050

**Offense Information:**   Homicide (SB 1292) - 05/31/2012 - El Paso County

**Suspect(s):**   SOLIS-GONZALEZ, LUIS (DOB 04/18/1977)

**Victim(s):**   SALDIVAR, MARYSOL (DOB 05/06/1978)

H███, C███████ (DOB ██████████)

DESANTIAGO, ERIC (DOB 12/29/1969)

**Elimination(s):**   S███████, L██ A████ (DOB ██████████)

**Submission Information:**

24 - Large Square Brown Box on April 02, 2014 by Estrada, Jorge VIA In Person
26 - Large Brown Bag on April 02, 2014 by Estrada, Jorge VIA In Person
27 - Large Brown Box on April 02, 2014 by Estrada, Jorge VIA In Person

Requested Analysis: Screen for biological evidence.

This is a supplemental Forensic Biology Report. Please refer to the most recent previous report issued on July 17, 2014 by Cathey L. Serrano. A reference to other reports is also mentioned on that report.

Evidence Description, Results of Analysis and Interpretation:

24 : Large Square Brown Box

24-01 : Safety 1st car seat from Nissan Titan (TX:21FVB4) (Item JE106)

No visible bloodstains were observed. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

24-02 : Car seat base from Nissan Titan (TX:21FVB4) (Item JE106)

No visible bloodstains were observed. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

26 : Large Brown Bag

26-01 : Blue "Disney" comforter from residence (Item JE102)

Apparent blood was detected. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

27 : Large Brown Box

27-40-AA : Green stone and diamond bracelet from residence (Item JE10)

Apparent blood was detected.



**27-41-AA : Motorola "Verizon" cell phone from residence (Item JE12)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-42-AA : Glass shards from residence (Item JE19)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-43-AA : "Plantronics" bluetooth ear piece from residence (Item JE27)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-44-AA : Two pieces of white plastic from residence (Item JE29)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-45-AA : Samsung "Verizon" cell phone from residence (Item JE31)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-46-AA : Red blanket from residence (Item JE33)**

No blood was detected. Samples were collected for possible DNA analysis. There were no indications of semen. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-47-AA : "Track" back pack with miscellaneous items behind rock wall of residence (Item JE35)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-47-AA-01 : Yellow safety vest from back pack behind rock wall of residence (Item JE35)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-47-AA-02 : Right leather glove from back pack behind rock wall of residence (Item JE35)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-47-AA-03 : Sunglasses from back pack behind rock wall of residence (Item JE35)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-47-AA-04 : Flashlight from back pack behind rock wall of residence (Item JE35)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-47-AA-05 : Hand brace from back pack behind rock wall of residence (Item JE35)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-47-AA-06 : Key ring with 6 keys from back pack behind rock wall of residence (Item JE35)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-47-AA-07 : Roll of toilet paper from back pack behind rock wall of residence (Item JE35)**

No visible bloodstains were observed.

**27-47-AA-08 : Two Husky brand screwdrivers from back pack behind rock wall of residence (Item**

JE36)

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-48-AA : Silver-tone cross pendant from residence (Item JE40)**

Apparent blood was detected.

**27-49-AA : Silver necklace from residence (Item JE41)**

Apparent blood was detected.

**27-50-AA : Silver ear ring from residence (Item JE43)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-51-AA : Glass shards from residence (Item JE37)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

**27-52-AA : "Piston Cup" back pack with clothing and toy from Nissan Titan (TX:21FVB4) (Item JE103)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-52-AA-01 : Black "Cars" t-shirt from back pack from Nissan Titan (TX:21FVB4) (Item JE103)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-52-AA-02 : Gray shorts from back pack from Nissan Titan (TX:21FVB4) (Item JE103)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-52-AA-03 : "Toy Story" underwear from back pack from Nissan Titan (TX:21FVB4) (Item JE103)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-52-AA-04 : Pair of black socks from back pack from Nissan Titan (TX:21FVB4) (Item JE103)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis. Trace evidence was collected. The collected trace evidence has been packaged with the evidence. No further analysis was conducted at this time.

**27-52-AA-06 : Toy figurine from back pack from Nissan Titan (TX:21FVB4) (Item JE103)**

No visible bloodstains were observed. Samples were collected for possible DNA analysis.

## Investigative Leads and Requirements for Further Analysis:

A separate report will be issued upon completion of DNA analysis.

## Disposition:

A portion of item 26-01 along with swabbings from items 27-40-AA to 27-47-AA, 27-47-AA-01 to 27-47-AA-06, 27-47-AA-08, 27-48-AA to 27-52-AA, and 27-52-AA-01 to 27-52-AA-06 will be stored



preserve the biological constituents. We are unable to retain the remaining evidence in our vault. Please make arrangements to pick up this evidence as soon as possible.

This report has been electronically prepared and approved by:

Christine Ceniceros
Forensic Scientist IV
Texas DPS El Paso Crime Laboratory

